**NORWILTON MURRAY**

v.

**FAIRBANKS MORSE,**
**BELOIT POWER SYSTEMS, INC., Appellant in No. 78-2224**

NORWILTON MURRAY, Cross-Appellant in No. 78-2225

United States Court of Appeals

Third Circuit

Argued April 26, 1979

Filed November 29, 1979

EDWARD C. GERMAN, ESQ. (LABRUM & DOAK), Philadelphia, PA, *for appellant in No. 78-2224* and *cross-appellee in No. 78-2225*

THOMAS ALKON, ESQ. (ISHERWOOD, COLIANNI, ALKON & BARNARD), Christiansted, St. Croix, V.I., *for appellee in No. 78-2224* and *cross-appellant in No. 78-2225*

Before ROSENN, MARIS and HUNTER, *Circuit Judges*

## OPINION OF THE COURT

ROSENN, *Circuit Judge*

This appeal raises several issues, including novel and important questions as to whether a comparative negligence statute may be applied and, if so, to what extent, in an action for personal injuries brought under twin theories of strict products liability and common law principles of negligence. The jury returned a verdict in favor of the plaintiff, Norwilton Murray, in the sum of two million dollars against the manufacturer, Beloit Power Systems, Inc. (Beloit). The jury, in response to a special interrogatories, found that plaintiff's negligence was a proximate cause of his injuries and that he was at fault to the extent of five percent. The trial judge re-

duced the verdict accordingly and judgment was thereupon entered for the plaintiff. Beloit's motion for a new trial was denied and it appealed. Murray has also cross-appealed contending that the trial court erred in applying contributory negligence as a defense to a products liability action grounded on section 402A of the Restatement (Second) of Torts and that it should not have reduced his verdict because of his own contributory negligence. We find no error on Beloit's appeal and we reject Murray's cross-appeal. Accordingly, we affirm the judgment of the district court.

## I.

At the time of the accident, Norwilton Murray, a thirty-four year old experienced instrument fitter, was employed by Litwin Corporation, an installer of equipment. On July 21, 1974, Murray and a co-worker were installing an electrical control panel at the Hess Oil Refinery in the Virgin Islands. The panel was built by Beloit to Litwin's specifications and Litwin's engineer approved it at Beloit's factory before it was shipped. Litwin intended to install the panel on a platform over an open space approximately ten feet above the concrete floor of the refinery. There was evidence, however, that Beloit had not been so informed. At Litwin's request the unit had been purposely left open at the bottom so that conduits from below could be attached to it. The control panel was removed from its shipping crate and a cherry-picker hoisted it by its metal lifting eyes onto the platform. In order to protect the integrity of the delicate instrumentation inside the panel, Beloit had attached two iron cross-members to the open bottom of the unit in order to stabilize it during shipping. Murray's task was to align the holes in the base of the control panel with pre-drilled holes in the platform and secure the unit with mounting bolts. Because the holes were

not perfectly aligned when the cherry-picker deposited the unit on the foundation. Murray chose to use a crow-bar to rock the approximately one and a half ton unit into alignment.

The accident occurred when Murray put his weight on one of the iron cross-members by leaning over the open space at the bottom of the unit to bolt it to the platform. The cross-member gave way and Murray fell approximately ten feet to the concrete floor incurring severe injuries to his spine. It was determined at trial that the cross-member gave way because it had been only temporarily or "tack-welded" to the unit, instead of being secured by a permanent or "butt-weld." Murray's spinal injuries led to two operations for a herniated disc. The most severe injury, however, was to the group of spinal nerves called the cauda equina, which affect sexual and urinary functions. As a consequence of this nerve damage, Murray is incontinent and sexually dysfunctional. The prognosis for improvement in his condition is poor, and it is possible that his injuries may ultimately cause him to be confined to a wheelchair and may reduce his life-span. He has not returned to work since the accident.

Murray brought a products liability action against Beloit alleging alternative theories of strict liability under Restatement (Second) of Torts § 402A and common law negligence. He contended that the control panel was defective because the cross-member had been only tack-welded to the unit. Beloit defended with expert evidence to prove that Murray's method of installation was highly dangerous and Beloit argued that Murray assumed the risk of injury posed by his manner of installation. The district court, holding that the Virgin Islands comparative negligence statute, 5 V.I.C. § 1451 (1978)[1] was ap-

---

[1] The pertinent provisions of 5 V.I.C. § 1451 (1978) are:
 (a) In any action based upon negligence to recover for injury to person or property, the contributory negligence of the plaintiff shall not bar a

plicable to a strict products liability action, instructed the jury that if they found Beloit liable and Murray negligent, to reduce Murray's award by the percentage attributable to his fault.[2]

The jury returned a verdict finding Beloit liable under both the strict products liability and the negligence counts. The jury also found Murray's negligence in installing the unit to constitute five percent fault for the injuries. The jury awarded Murray $2,000,000 in damages. This sum, when reduced by the five percent fault attributable to Murray and the reduction to present value of his future earnings, amounted to $1,747,000. Although noting that the verdict was very high, the district court denied defendant's motion for a new trial.

On appeal to this court, Beloit essentially raises three[3] questions: First, it was error for plaintiff's counsel to specifically request the jury to return a verdict, which it apparently honored, for $2,000,000. Second, the district court

recovery, but the damages shall be diminished by the trier of fact in proportion to the amount of negligence attributable to the plaintiff. The burden of proving contributory negligence shall be on the defendant. If such claimant is found by the trier of fact to be more at fault than the defendant, or, in the case of multiple defendants, more at fault than the combined fault of the defendants, the claimant may not recover.

(b) This section does not apply to any action based upon a statute the violation of which imposes absolute liability, whether or not such statute comprehends negligent conduct.

(c) The trier of fact shall report by general verdict the total damages, in dollars and cents, not reduced by any contributory negligence of plaintiff, and if plaintiff is found to be contributorily negligent, shall also report the amount to which the damages are reduced by reason thereof, in dollars and cents, in which case the lesser monetary amount shall be the final verdict in the case.

[2] The Virgin Islands statute is a modified comparative negligence statute which bars recovery if the plaintiff's fault is determined to be greater than that of the defendant.

[3] Beloit also argues that a new trial was warranted because the verdict was in large part affected by the testimony of a non-treating physician not listed as a witness until immediately before trial and not made available to the defense until trial. The record reveals, however, that the district judge offered Beloit a recess to evaluate the witness. Beloit accepted a short recess and made no further objection or a request for a continuance. In these circumstances, we see no merit to this contention. We will take up the third argument, infra in the context of the application of comparative negligence principles to this case.

654

erred in not granting a new trial on the ground that the verdict was excessive and third, in not granting a new trial because the jury fixed Murray's fault at only five percent, even though the jury found that his own negligence was a proximate cause of his injuries.

Beloit first contends that it was improper for the trial court to permit Murray's counsel to plead for a specific sum of damages in his closing remarks to the jury.[4] Beloit maintains that counsel's plea for a $2,000,000 verdict was highly improper and incited the jury to award a high verdict not in accordance with the evidence. The jury returned a verdict in the precise sum urged by counsel Beloit relies primarily on Joyce v. Smith, 269 Pa. 439, 442–43, 112 A. 549 (1921), which held that the amount of damages claimed is not to be determined by an estimate of counsel "but by the jury from the evidence before them, and any suggestion to the jury of an arbitrary amount is highly improper . . . ." Although a few courts do take the view that a reference by counsel to a specific sum of damages in a personal injury action[5] is improper, the majority do not. See Duguay v. Gelinas, 104 N.H. 182, 182 A.2d 451 (1962); Caley v. Manicke, 24 Ill.2d 390, 182 N.E.2d 206 (1962); Philadelphia & R.R. Co. v. Skerman, 247 F. 269 (2d Cir. 1917). See cases collected at Annot. 14 A.L.R.3d 541, 545 (1967). Some courts apparently do not pass upon the propriety of reference to a specific amount, but require a showing of prejudice before reversal is warranted. See Symons v. Great Northern R. Co., 208 Minn. 240, 293 N.W. 303 (1940).

---

[4] We can find no case in the Virgin Islands approving or disapproving of counsel's request for a specific sum of damages. Plaintiff's counsel maintains that such a specific request is generally acceptable trial practice in the Virgin Islands.

[5] Pennsylvania and New Jersey appear to be the minority states which hold that a plea by counsel for a specific sum is improper. See Joyce v. Smith, supra; Botta v. Brunner, 26 N.J. 82, 138 A.2d 713 (1958).

■ We need not decide the issue, however, because we find no objection in the record by the defendant to opposing counsel's reference to a specific ad damnum. Counsel's failure to object precludes him from seeking a new trial on the grounds of the impropriety of opposing counsel's closing remarks. Gilmore v. Strescon Industries, Inc., 66 F.R.D. 146, 152 (E.D. Pa.), aff'd, 521 F.2d 1398 (3d Cir. 1975). We decline to review the matter as plain error.

We turn next to Beloit's contention that the verdict was excessive. The final adjusted figure of $1,747,000 awarded Murray appears to be the highest damage award in a Virgin Islands personal injury action. Judge Young, the trial judge, however, declined to order a remittitur or new trial on the issue of damages. He noted that although he personally would not have awarded as high a verdict, "[i]t is not enough that the Court, as the trier of fact, would have awarded a lesser amount of damages. Rather, the damages assessed by the jury must be so unreasonable as to offend the conscience of the Court. See also, Tann v. Service Distributors, Inc., 56 F.R.D. 593 (E.D. Pa. 1972), aff'd 481 F.2d 1399 (3d Cir. 1973)." Judge Young declined to set aside the jury's verdict and concluded that there was substantial evidence in the record upon which it could have based its award.

■ In exercising our power of review over the damage award in this case, we are mindful that the scope of our review is extremely narrow. In Edynak v. Atlantic Shipping, Inc. CIE., Chambon, 562 F.2d 215, 225–226 (3d Cir. 1977), cert. denied, 434 U.S. 1034 (1978) we stated:

The question of the excessiveness of a verdict is primarily a matter to be addressed to the sound discretion of the district judge, and we may not disturb his determination unless a "manifest abuse of discretion" be shown . . . . Stated another way, we may reverse the determination of the district judge and grant a new trial only if the verdict is "so grossly excessive as to shock the judicial conscience." (Citations omitted.)

656

We cannot perceive an abuse of discretion merely because we would have found the damages to be considerably less than those awarded and would have set them aside had we been the district court. Id. at 226; Dagnello v. Long Island R. Co., 289 F.2d 797, 806 (2d Cir. 1961). The trial judge is in the best position to evaluate the evidence and assess whether the jury's verdict is rationally based. Edynak, supra, 562 F.2d at 226–227 citing Taylor v. Washington Terminal Co., 133 U.S. App. D.C. 110 409 F.2d 145, 148, cert. denied, 396 U.S. 835, 90 S.Ct. 93, 24 L.Ed.2d 85 (1969). Nevertheless, there is a limit beyond which an appellate court must reverse an award as grossly excessive. The United States Supreme Court has cautioned that we must "make a detailed appraisal of the evidence bearing on damages" in deciding whether a verdict is excessive. Grunenthal v. Long Island R.R. Co., 393 U.S. 156, 159 (1968). We must therefore turn to the record to see if the district court was correct in concluding that the jury's award was not the product of irrational behavior.

The jury's initial award of $2,000,000 represented $1,700,000 for "lost income (past), mental anguish, past and future, loss of enjoyment of life, past and future," and $300,000 for impaired future earning capacity. The plaintiff did not prove any specific amount of either past or anticipated medical expenses. The lost future earnings award was reduced to a present value of $153,612.00. The verdict was then adjusted by the five percent attributed to Murray's fault, making the final figure $1,747,000.00. Thus, the jury's award almost totally represents an award for mental suffering and loss of enjoyment of life.[6] However, as we have noted, "[e]vidence of pain and suffering is particularly ill-suited to review upon only a written record." Edynak, supra, 562 F.2d at 227 n.16. According to this record, Murray sustained severe and de-

---

[6] Murray's lost past income was calculated at $35,000.

bilitating injuries. Direct examination of Dr. Hiram Mercado, a neurologist and Murray's chief medical expert revealed that Murray sustained two severe injuries to his spine.[7] The fall resulted in a herniated disc and damage to the cauda equina, which control urinary, fecal, and sexual functions. Murray was initially hospitalized for seventeen days following the accident during which time he was placed in bedrest with leg traction. During his hospitalization Murray experienced problems with micturition (passing of water). He was released from the hospital but was unable to walk properly because of severe pain. He subsequently underwent two spinal operations to remove a herniated disc. Murray, however, continued to experience back pain.

Murray's most damaging injury was to his cauda equina. The damage to these nerves resulted in a neurogenic bladder, which causes spontaneous urine elimination. Murray is forced to wear a genital clamp to control his bladder. The bladder condition also poses the threat of recurrent infections, which might eventually endanger the kidneys. Dr. Sidney Weinberg, a urologist treating Murray, testified that the bladder condition has worsened and that there is a reasonable possibility that the kidneys may become fatally damaged. There is also evidence that Murray's spinal injuries have resulted in sexual dysfunction. Murray's prostate gland also might have to be removed to protect his kidneys. This would not cure, and might worsen his incontinence and render him sexually impotent. Murray is taking drugs which help to reduce the frequency of urination but the overall prognosis is poor. Murray testified that pain from sitting forces him to lie down for two or three hours at a time.

---

[7] Dr. Mercado was the non-treating physician complained of by Beloit. See note 3 supra. His testimony was based wholly upon his examination and evaluation of the medical reports of the treating physicians.

He claimed severe psychic damages; he is now divorced and he no longer has a healthy relationship with his children and friends.

On cross-examination, Dr. Mercado admitted that some of Murray's treating physicians had noticed improvement in his condition and that he could resume some light work. Murray admitted that he had fathered a child since the accident, but complained that he was almost completely dysfunctional. There also was evidence that Murray was able to drive a car because he was involved in an automobile accident after the fall.

■ Faced with this record, we cannot unequivocably conclude that the jury's damage award was irrational or so excessive as to shock our conscience. The jury was in the best position to evaluate the credibility of the medical evidence and the record reveals a sufficient basis for its ultimate award. Murray will continue to suffer the debilitating consequences of his injuries which perforce will limit the quality of his life-style and probably the extent of his life-span. Although we believe that the jury's award was very high and that more severely injured plaintiffs have often received less compensation, we cannot say that the district court abused its discretion in failing to reduce the verdict as excessive.

### III.

We now turn to the claims of both parties that damages were improperly apportioned. Murray has cross-appealed and we shall first consider whether his award should have been reduced by the five percent fault attributed to his negligence in causing his injuries. We must determine whether the district court was correct in applying the Virgin Islands comparative negligence statute, 5 V.I.C. § 1451 in a strict products liability action.

In a traditional strict products liability action brought

under Restatement (Second) of Torts, § 402A, the plaintiff need prove only three elements to recover: (1) the existence of a defect, (2) in an unreasonably dangerous condition, (3) which proximately causes the injury.[8] Although the defendant is held strictly liable for the condition of his product, that liability is not absolute. The Restatement recognizes the defense of voluntary unreasonable assumption of the risk, although contributory negligence in the sense of failing to discover or guard against the defect is not a defense. Restatement (Second) of Torts, § 402A, Comment n. Thus, mere carelessness in using the product will not bar the plaintiff from recovery. See, e.g., Means v. Sears, Roebuck & Co., 550 S.W.2d 780, 787 n.6 (Mo. 1978); Cepada v. Cumberland Engineering Co., 76 N.J. 152, 164, 386 A.2d 816, 832 (1976). The Restatement does provide, however, that assumption of the risk will bar recovery: "If the user or consumer discovers the defect and is aware of the danger, and nevertheless proceeds unreasonably to make use of the product and is injured by it, he is barred from recovery." Restatement (Second) of Torts, § 402A, Comment n. In addition to assumption of the

---

[8] Restatement (Second) of Torts (1965):

§ 402A. Special Liability of Seller of Product for Physical Harm to User or Consumer

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Restatement law is authoritative in the Virgin Islands in the absence of local law to the contrary. 1 V.I.C. § 4 (1967).

Some jurisdictions have abolished the Restatement requirement that the product be shown to be unreasonably dangerous. See, e.g., Cronin v. J.B.E. Olson Corp., 8 Cal.3d 121, 501 P.2d 1153, 104 Cal. Rptr. 433 (1972); Azzarello v. Black Bros. Co., Inc., 480 Pa. 547, 559, 391 A.2d 1020, 1027 (1977) applied in Baker v. Outboard Marine Corp., 595 F.2d 176, 182 (3d Cir. 1979).

risk, product misuse unforeseeable to the defendant is also an absolute defense to a strict products liability action.[9] See Noel, Defective Products: Abnormal Use, Contributory Negligence and Assumption of Risk, 25 Vand.L.Rev. 93, 119–28 (1972); Dale and Hilton, Use of the Product—When is it Abnormal?, 4 Willamette L.J. 350, 352 (1967). Thus, although the impediments to plaintiff's recovery are greatly diminished by the strict product liability doctrine, nonetheless, the defendant may be relieved from liability when plaintiff's conduct is especially egregious.

In the present case, Beloit requested a jury instruction that Murray's voluntary assumption of risk would constitute a complete bar to recovery. Murray, on the other hand, requested an instruction that ordinary contributory negligence was not a defense to a section 402A action. The district court declined to issue either instruction and instead, applying the Virgin Islands comparative negligence statute, instructed the jury that they could reduce any award for Murray by whatever fault they ascribed to his negligence in causing the accident.[10] Judge Young later explained his position:

The Court is of the opinion that neither of the positions advanced by the parties should govern the law of strict products liability in the Virgin Islands, but that both plaintiff's want of ordinary due care in his use of the product and plaintiff's unreasonable exposure

---

[9] Restatement (Second) of Torts § 402A, Comment (h) provides:

> A product is not in a defective condition when it is safe for normal handling and consumption. If the injury results from abnormal handling . . . abnormal preparation for use . . . or from abnormal consumption, the seller is not liable. Where, however, he has reason to anticipate that danger may result from a particular use . . . he may be required to give adequate warning of the danger . . . and a product sold without such a warning is in a defective condition.

[10] The court's instruction read:

> If you find, by a preponderance of the evidence, some negligence on the part of Norwilton Murray, which approximately [sic] contributed to the injuries which he received such negligence may be considered by you in offsetting the damages, if any which you feel that the Defendant is responsible for under the theory of strict liability.

to a known and appreciable risk of injury should work to diminish plaintiff's recovery in a § 402A type action in proportion to the amount of causative culpable conduct attributable to plaintiff. The mere failure of plaintiff to discover or guard against the existence of a defect where plaintiff had no reason to suspect the same would not constitute a defense in a § 402A type action.

Murray v. Beloit Power Systems, Inc., 450 F.Supp. 1145, 1147 (D.V.I. 1978) (footnote omitted).

Judge Young admitted that the elimination of assumption of risk as a total bar to recovery was contrary to the Restatement position but concluded that under the Virgin Islands statute the application of comparative negligence principles to strict products liability actions "will provide the most equitable means of ascertaining ultimate tort liability." Id. at 1147. It is the wisdom of this last statement which we must assess in deciding whether comparative negligence should apply, and to what extent, to a section 402A action.

## IV.

We are faced with an initial problem not fully considered by the district court. As indicated above, comparative negligence has been adopted by statute in the Virgin Islands, 5 V.I.C. § 1451. The statute provides that contributory negligence is replaced by comparative negligence "[i]n any action based upon *negligence* to recover for injury to person or property . . . ." 5 V.I.C. § 1451(a) (emphasis supplied).

Some form of comparative negligence has been adopted by the majority of American jurisdictions in ordinary negligence actions to replace the harsh rule of contributory negligence which absolutely bars a plaintiff from recovery, even if his negligence is slight when compared with the defendant's. The advent of comparative negligence has been widely praised by legal scholars and courts who believe that it offers a more equitable apportionment of damages. See W. Prosser, Law of Torts, § 67 (4th ed. 1971). Thus, our

first inquiry must be whether we may apply the statute in the strict products liability context.

The almost universal recognition by courts and legislators of the doctrine of strict products liability has provided consumers with a powerful legal weapon against merchants of defective products. Since Justice Traynor's seminal decision in Greenman v. Yuba Power Products Co., 59 Cal.2d 57, 377 P.2d 897, 27 Cal. Rptr. 697 (1963), the past fifteen years have witnessed a virtual explosion of litigation in the products liability field. By eliminating the impediments of contractual privity and proof problems associated with negligence theory, the strict products liability action, as recognized in the Restatement (Second) of Torts § 402A, has become an extremely attractive vehicle which plaintiffs can mount to achieve legal recovery. Further, because contributory negligence generally has not been recognized as a defense to a section 402A action, the possibility that a plaintiff might be barred from recovery because of his own misconduct has been significantly narrowed to those cases in which voluntary assumption of the risk or product misuse occurs.

The use of comparative negligence principles in the strict products liability arena has generated a debate among courts and legal commentators concerning the conceptual feasibility and doctrinal desirability of comparing the misconduct of the plaintiff with the strict liability imposed on the defendant under section 402A. Several courts have indicated a willingness to apply comparative principles to strict products liability doctrine in an effort to achieve a more equitable distribution of the loss resulting from injuries to which the plaintiff may himself have contributed. See, e.g., Butaud v. Suburban Marine & Sporting Goods, Inc., 555 P.2d 42 (Alaska 1976); Daly v. General Motors Corp., 20 Cal. 3d 725, 575 P.2d 1162, 144 Cal. Rptr. 380 (Cal. 1978); West v. Caterpillar Tractor Company, Inc.,

336 So.2d 80 (Fla. 1976). On the other hand, several courts have viewed comparative negligence principles as fundamentally incompatible with strict products liability and have declined to extend comparative negligence statutes to section 402A cases. See, e.g., Melia v. Ford Motor Co., 534 F.2d 795 (8th Cir. 1976) (applying Nebraska law); Kinard v. The Coats Company, Inc., 37 Colo. App. 555, 553 P.2d 835 (1977).

Of the states with comparative negligence statutes, there is a division of authority as to whether the statute may be applied in strict products liability cases. Some have declined to apply their comparative negligence statute because the statute is limited to *negligence* actions. Thibault v. Sears, Roebuck & Co., 395 A.2d 843 (N.H. 1978); Kirkland v. General Motors Corp., 521 P.2d 1353, 1367–68 (Okla. 1974). Other jurisdictions with comparative negligence statutes facially limited to negligence actions have nevertheless invoked the statute in a strict products liability context. See, e.g., Edwards v. Sears, Roebuck & Company, 512 F.2d 276 (5th Cir. 1975) (applying Mississippi law); Sun Valley Airlines, Inc. v. Avco-Lycoming Corp., 411 F.Supp. 598 (D. Idaho 1976), Dippel v. Sciano, 37 Wis.2d 443, 155 N.W.2d 55 (1967). The rationale has been either that strict products liability is akin to "negligence per se," and thus within the purview of the comparative negligence statute, or that the legislature, having expressed no opinion about the statute's applicability to products liability law, therefore left open the possibility that comparative principles should apply. Compare Dippel, supra, 37 Wis.2d at 461, 155 N.W.2d at 64 with Stueve v. American Honda Motors Co., Inc., 457 F.Supp. 740, 752 (D.Kan. 1978). Faced with this equivocal history of the application of comparative negligence statutes in strict products liability cases, we must decide whether we should

extend the Virgin Islands comparative negligence statute to strict liability cases predicated on section 402A.

In applying the Virgin Islands comparative negligence statute to this suit, the district court expressly adopted the "position and policy considerations advanced by the Wisconsin Supreme Court in Powers v. Hunt-Wesson Foods, Inc., 64 Wis.2d 532, 219 N.W.2d 393 (1974) and Dippel v. Sciano, 37 Wis.2d 443, 155 N.W.2d 55 (1967)." 450 F.Supp. at 1147. The Dippel case was the first decision to apply a comparative negligence statute to a strict products liability action. Wisconsin's modified comparative negligence statute bars the plaintiff from recovery if his negligence is "as great as" that of the defendant. Wis. Stat. § 895.045. The Wisconsin approach is to view the strict products liability action as "akin to negligence per se" and therefore within the purview of the comparative negligence statute. 155 N.W.2d at 64. By adopting the Wisconsin approach, the district court justified the application of the Virgin Islands comparative negligence statute, arguably limited to negligence actions, to strict products liability.

■■ We disagree with the district court's adoption of Wisconsin's gloss on section 402A actions as negligence per se. The Restatement makes it quite clear that strict liability is imposed on the defendant even if he has exercised "all possible care in the preparation and sale of his products." Restatement (Second) of Torts § 402A(2) (a). The focus of the strict products liability action is on the condition of the product and not on the conduct of the defendant. The Washington Supreme Court rejected the Wisconsin view stating: "Once the plaintiff has proven the product was not reasonably safe, the defendant is liable in damages and cannot absolve itself by proving lack of negligence." Teagle v. Fischer & Porter Co., 89 Wash. 2d 149, 570 P.2d 438, 444 (1977). When the Restatement recognized the doctrine of strict products liability, we be-

lieve the drafters envisioned a form of tort liability separate and apart from negligence theory. The advantage of strict products liability theory is that the plaintiff need only prove the existence of a product defect and not that negligence caused it. The problem is that products liability cases are often tried on alternative theories of negligence and strict liability and the temptation to view strict liability as a species of presumptive negligence is inviting. We decline any such invitation because we believe that a satisfactory union of strict liability and comparative negligence principles cannot be conceptually achieved by converting an action predicated upon a product defect into a hybrid action adulterated by proof of personal misconduct.

 If strict products liability cannot be analogized to negligence per se, is there any authority in the Virgin Islands comparative negligence statute to support its application to Restatement § 402A? Although the Virgin Islands statute is expressly applicable to "any action based upon negligence," the legislature has expressed no opinion as to whether the statute is applicable to section 402A. The comparative negligence statute is made expressly inapplicable *only* to statutorily based absolute liability actions. 5 V.I.C. § 1451(b). However, a strict products liability action under the Restatement involves neither statutorily based liability nor absolute liability. Thus, although the Virgin Islands comparative negligence statute does not expressly authorize its application to strict products liability actions, it does not expressly forbid it. In such a case, "it is just as reasonable to assume the passage of a comparative negligence statute was not designed to preclude a comparison of fault in strict liability actions, . . . and to extrapolate that if the principle is helpful and fair, 'it should be applied by [a] court as a principle of common law. . . .'" Stueve, supra, 457 F.Supp. at 751 (citations

omitted).[11] We are therefore left with the complex task of determining how comparative principles should operate in strict products liability cases.

## V.

██ We agree with the district court that the use of comparative principles in section 402A actions can achieve a more equitable allocation of the loss from product related injuries. We are mindful, however, of the current conceptual confusion among the courts, and the difficulties confronting us in comparing plaintiff's personal conduct with the strict liability of the defendant for his product defect.

██ Comparative negligence principles have often been referred to interchangeably as systems of comparative fault. Under such systems, contributory negligence is seen as a misnomer. Daly, supra, 515 P.2d at 1168. Negligence theory sees the imposition of a duty of care as requiring one not to expose another to an unreasonable risk of harm. When a plaintiff is contributorily negligent, he does not violate a duty owed to another, but instead creates an unreasonable risk of harm to himself. Prosser, supra, § 65 at 418. Thus, it is more accurate to term contributory negligence as "contributory fault." Id.; Daly, supra, 575 P.2d at 1168. "Conduct that is characterized as negligent is commonly recognized as fault." Wade, Products Liability and

---

[11] Murray argues that our common law powers are restricted by 1 V.I.C. § 4 which makes Restatement law authoritative in the Virgin Islands in the absence of local law to the contrary. He contends that the legislature is the appropriate body to determine if comparative principles should be extended to Restatement § 402A actions. The Restatement, however, is silent on the issue of the use of comparative principles in strict products liability actions, and as we have noted, the Virgin Islands' comparative negligence statute is also unclear as to its application to section 402A actions. However, the Virgin Islands legislature has clearly indicated that comparative principles will be applied in negligence cases and we believe that it is consistent with and advances legislative policy to extend, under common law, comparative principles to section 402A.

Plaintiff's Fault—The Uniform Comparative Fault Act, 29 Mercer L.Rev. 373, 376 (1978).

██ "Fault," however, is not a term without its own conceptual difficulties. The term in its popular usage connotes moral blameworthiness. Although fault when used to describe criminal conduct often reflects a moral judgment by society, it has no such implications in tort law.

There is a broader sense in which "fault" means nothing more than a departure from a standard of conduct required of a man by society for the protection of his neighbors; and if the departure is an innocent one, and the defendant cannot help it, it is none the less a departure, and a social wrong.

Prosser, supra, § 75 at 493.

Thus, in tort law, fault is a shorthand way of describing conduct that falls below the standard of care of a reasonable person irrespective of the subjective motives of the actor.

Comparative fault would seem to function smoothly in those negligence cases in which the defendant is at fault for violating a duty of care owed to the plaintiff by exposing him to an unreasonable risk of harm and the plaintiff is at fault for enhancing the danger by exposing himself to an unreasonable risk of harm. The jury is simply asked to compare the conduct of the parties. But in strict products liability actions, where the focus is on the product defect and not on the defendant's personal misconduct, can comparative fault principles be applied effectively?

 Strict products liability evolved by stripping away certain problems of proof plaintiffs encountered under either negligence or warranty theories. Daly, supra, 575 P.2d at 1168 (quoting cases). By focusing the legal inquiry on the product defect rather than the defendant's conduct and thereby easing the plaintiff's burden of proof, strict liability theory endeavors to place the risk of eco-

nomic loss on the manufacturers of defective products, thereby spreading the loss and not saddling it solely on an innocent injured consumer. Stueve, supra, 457 F.Supp. at 753–54; Daly, supra, 575 P.2d at 1168. See Greenman v. Yuba Power Products Co., 59 Cal.2d 57, 27 Cal. Rptr. 697, 377 P.2d 897, 901 (1963). Because manufacturers bear the loss, strict products liability also has the desirable effect of deterring manufacturers and sellers from introducing unsafe products into the stream of commerce.

The elimination of the need to prove defendant's negligence has led some to view strict products liability as a "no-fault" doctrine to which the application of comparative negligence principles is simply not conceptually feasible. See, e.g., Daly, supra, 575 P.2d at 1185 (Mosk, J., dissenting); H. Levine, Strict Products Liability and Comparative Negligence: The Collision of Fault & No Fault, 14 San Diego L.Rev. 337, 351 (1977). According to Dean Wade, however, fault is still present in strict products liability cases despite the focus on the product defect:

> In the case of products liability, the fault inheres primarily in the nature of the product. The product is "bad" because it is not duly safe; it is determined to be defective and (in most jurisdictions) unreasonably dangerous . . . . [S]imply maintaining the bad condition or placing the bad product on the market is enough for liability . . . . One does not have to stigmatize conduct as negligent in order to characterize it as fault.

Wade, supra, 29 Mercer L.Rev. at 377 (footnotes omitted). Dean Aaron Twerski adds perspective on the relationship between defect and fault: "In this imperfect world it is not an outrageous inference that a bad defect most probably stems from serious fault—even if the fault need not nor cannot be established." Twerski, From Defect to Cause to Comparative Fault—Rethinking Some Product Liability Concepts, 60 Marq.L.Rev. 297, 331 (1977).

The substitution of the term fault for defect, however,

would not appear to aid the trier of fact in apportioning damages between the defect and the conduct of the plaintiff. The key conceptual distinction between strict products liability theory and negligence is that the plaintiff need not prove faulty *conduct* on the part of the defendant in order to recover. The jury is not asked to determine if the defendant deviated from a standard of care in producing his product. There is no proven faulty conduct of the defendant to compare with the faulty conduct of the plaintiff in order to apportion the responsibility for an accident. Although we may term a defective product "faulty," it is qualitatively different from the plaintiff's conduct that contributes to his injury. A comparison of the two is therefore inappropriate. The characterization of both plaintiff's negligent conduct and the defect as faulty may provide a semantic bridge between negligence and strict liability theories, but it provides neither a conceptual nor pragmatic basis for apportioning the loss for a particular injury.

We believe that if the loss for a particular injury is to be apportioned between the product defect and the plaintiff's misconduct, the only conceptual basis for comparison is the causative contribution of each to the particular loss or injury. In apportioning damages we are really asking how much of the injury was caused by the defect in the product versus how much was caused by the plaintiff's own actions. We agree with the Ninth Circuit when it noted that comparative causation "is a conceptually more precise term than 'comparative fault' since fault alone without causation does not subject one to liability." Pan-Alaska Fisheries, Inc. v. Marine Construction & Design Co., 565 F.2d 1129, 1139 (9th Cir. 1977). See Butaud, supra, 555 P.2d at 46 (Rabinowitz, J., concurring); Twerski, The Many Faces of Misuse: An Inquiry Into the Emerging Doctrine of Comparative Causation, 29 Mercer

L.Rev. 403, 410 (1978). The appropriate label for the quality of the act is insignificant. Sun Valley Airlines, Inc., supra, 411 F.Supp. at 603 n.5. Thus, the underlying task in each case is to analyze and compare the causal conduct of each party regardless of its label. Although fault, in the sense of the defendant's defective product or the plaintiff's failure to meet a standard of care, must exist before a comparison takes place,[12] the comparison itself must focus on the role each played in bringing about the particular injury.

Comparative causation is not a new concept in strict products liability cases. See, e.g., Sun Valley Airlines, Inc., supra, Stueve, supra, Butaud, supra, 555 P.2d at 46 (Rabinowitz, J., concurring); Thibault, supra; General Motors v. Hopkins, 545 S.W.2d 344 (Tex. 1977); Twerski, The Many Faces of Misuse: An Inquiry Into the Emerging Doctrine of Comparative Causation, 29 Mercer L.Rev. 403 (1978). However, as with many tort principles, much confusion exists about the nature of causation. Causation may be analytically separated into two distinct forms: cause-in-fact and proximate cause. Before an individual may be held responsible for injury, his conduct must be "a cause-in-fact" of the injury. Causation-in-fact has been traditionally interpreted as involving a "but-for" test: but for the conduct would the injury have occurred? In recent years, however, this but-for test has been glossed to mean that if the conduct is a "substantial factor" in bringing about the injury, the conduct is a "cause-in-fact" of the injury. Prosser, supra, § 41 at 240.

Proximate cause, on the other hand, assumes the presence of causation-in-fact and asks whether the individual

---

[12] We believe the initial determination of fault is necessary to avoid situations in which conduct that is reasonable on the part of the plaintiff might contribute causally to an injury and the plaintiff would accordingly bear part of the loss. Only when conduct fails to meet a societal standard of reasonable care should the causal link between conduct and injury be examined.

should be held liable for the loss even though his conduct was a substantial factor in bringing it about. Prosser defines proximate cause as "legal" or "responsible" cause. Id. Proximate cause is "essentially a question of whether the policy of the law will extend the responsibility for the conduct to the consequences which have in fact occurred." Id. For example, if another cause intervenes between the individual's act and the injury, it may be undesirable from a policy standpoint to place the loss on the individual despite his action being a cause-in-fact of the injury. Likewise, if the consequences of a particular act are unforeseeable to the actor, it may be unjust to impose liability despite the presence of causation-in-fact.

 The relevant causation inquiry in a strict products liability suit should be whether the product defect "caused-in-fact" some or all of the injury and whether the plaintiff's faulty conduct "caused-in-fact" all or some of the injury. If the answer to both these questions is affirmative, the issue of proximate cause becomes relevant. Were there any intervening causes or unforeseeable consequences which would absolve the defendant of liability for the defect or the plaintiff for his conduct? It is conceivable that in any given accident, both the product defect and the plaintiff's conduct may be substantial factors in bringing about the injury. Under a comparative causation approach, once the jury has determined that the product defect caused the injury, the defendant is strictly liable for the harm caused by his defective product. The jury, however, would be instructed to reduce the award of damages "in proportion to the plaintiff's contribution to his own loss or injury." Pan-Alaska Fisheries, supra, 565 F.2d at 1139.

The use of causation as the conceptual bridge between the plaintiff's conduct and the defendant's product in no way jeopardizes the conceptual integrity of the strict products liability action. The focus is still on the product de-

fect. Semantically, apportioning damages in strict products liability cases may be termed a system of "comparative fault" but the real division occurs along lines of causation.[18] However, "because the term 'comparative fault' appears to be commonly accepted and used," id., we shall use that label to represent a system of apportioning damages in strict products liability cases.

## VI.

■ Once a conceptually viable way of apportioning damages in section 402A actions is established, the key inquiry is whether such a system is consistent with the policy goals of strict products liability. As we have indicated already, a central goal of the strict liability action is to relieve the plaintiff of proof problems associated with existing negligence and warranty theories. A system of comparative fault which proceeds to apportion damages on the basis of causation in no way disturbs the plaintiff's burden of proof. The plaintiff still need only prove the existence of a defect causally linked to the injury. The defendant's burden is to prove plaintiff's contributory fault.

A second goal of strict products liability is to place the "burden of loss on manufacturers rather than . . . injured persons *who are 'powerless to protect themselves . . . .'*" Daly, supra, 575 P.2d at 1168 quoting Greenman, supra, 377 P.2d at 901 (original emphasis). Under tradi-

---

[18] Indeed, this appears to be the thrust of the new Proposed Uniform Comparative Fault Act. Under this proposed model act, strict liability is included definitionally within the scope of the term "fault." Uniform Comparative Fault Act § 1(b). This is accomplished by attributing fault to the defectiveness of the product. See Wade, supra, 29 Mercer L.Rev. at 377. However, the Uniform Act recognizes that "[l]egal requirements of causal relation apply both to fault as the basis for liability and to contributory fault." Uniform Comparative Fault Act § 1(b). In determining the percentages of fault attributed to each party, the Uniform Act states that "the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed." Id. § 2(b).

tional strict products liability law, the ordinary contributory negligence of the plaintiff has been held not to be an available defense. Contributory negligence may occur in two ways in products liability cases. The plaintiff may be negligent in his actual use of the product or he may be negligent in failing to discover the product defect. Because the defendant exposes the plaintiff to a risk of harm by placing a dangerous product on the market, traditional thinking is that he alone should bear the loss despite the presence of such contributory negligence. The rationale is that the manufacturer is in a better position to absorb the economic loss by spreading the risk of loss through the chain of distribution. Eventually the cost is passed on to society as a whole in the form of an increased cost of the product.

The problem with this "deep pocket" rationale is that the manufacturer may be paying for a part of the loss which is attributable not to the product defect, but to plaintiff's conduct. If contributory negligence is ignored in determining the extent of plaintiff's loss, then the future cost of the manufacturer's product will be artificially inflated and will not accurately represent the actual risk posed by the defective product. Although individual plaintiffs may benefit from the immunity currently given for their contributory negligence, the consuming public at large may be adversely affected. If the future cost of a product does not accurately reflect the risk posed, then consumers may actually choose cheaper, less safe products because the cost of the manufacturer's product is artificially high. See generally, G. Calabresi, The Costs of Accidents, Yale Univ. Press (1970).

■ The recognition of contributory fault as an absolute bar to recovery would improperly shift the total loss to the plaintiff. Under a system of comparative fault, however, there are good reasons for allowing some form of

contributory fault to be considered in reducing damages. When plaintiff's conduct is faulty, i.e., he exposes himself to an unreasonable risk of harm which causes part of his injuries, the manufacturer should not be required to pay that portion of the loss attributable to the plaintiff's fault. Under a comparative system, the future cost of the defendant's product will accurately represent the danger it has caused and not the danger caused by plaintiff's own fault.[14]

Under traditional strict products liability theory, the defenses of assumption of the risk, in the sense of a voluntary encounter with a known product defect, and product misuse unforeseeable to the defendant operate as absolute bars to plaintiff's recovery. Although the elimination of assumption of the risk as a complete bar to recovery may be consistent with a proper allocation of the loss in strict products liability cases, we need not consider the contours of the assumption of risk defense because there is no evidence in this case that Murray in any way voluntarily proceeded to encounter a known product defect.[15]

---

[14] There is a legitimate concern, however, that if contributory negligence, in the sense of failing to discover the product defect, is recognized as a category of plaintiff's fault, almost every case of products liability will be open to loss apportionment through protracted litigation. Defendants will always argue that the plaintiff negligently failed to find the defect. Such a defense might intrude on another goal of strict products liability, that of discouraging the introduction of obviously defective products into the stream of commerce. If the plaintiff can be held responsible for not discovering the defect, there is an incentive to make defects obvious and not eliminate them from products. But when the plaintiff is contributorily at fault, in the sense of exposing himself to an unreasonable risk of harm in the use of the product, such conduct is to be considered plaintiff's legal fault, thereby triggering the comparative causation analysis. This view is consistent with the position adopted by Judge Young in his memorandum opinion in the instant case. 450 F.Supp. at 1147.

[15] Judge Young in his opinion indicated that assumption of the risk would no longer be a complete bar to recovery in a section 402A action when comparative negligence principles are applied. See page 661–62, supra; 450 F.Supp. at 1147. However, in our recent decision in Keegan v. Anchor Inns, Inc., 16 V.I. 635 (3d Cir. 1979), we held that, in negligence cases, the term "assumption of risk" would be applied only to non-negligent conduct constituting waiver or consent. Negligent conduct previously termed assumption of risk would now be considered as contributory negligence under the Virgin Islands comparative negligence statute. We also note

Similarly, because the jury found that no product misuse unforeseeable to the defendant had occurred, we leave for another day the application of comparative fault principles to cases of product misuse.[16]

We are aware that genuine lack of consensus exists in jurisdictions utilizing comparative principles in product liability cases as to the specific method for calculating damages. Some jurisdictions apply a "pure" system of dividing damages under which the trier of fact is asked to assign a percentage of fault to each party with the resultant total to equal one hundred percent. See, e.g., Butaud, supra; Daly, supra; West, supra. Under such systems, the plaintiff is not barred from recovery even if his fault is "as great as" or "greater than" that of the defendant. We believe that only a pure system of apportioning damages is appropriate in strict products liability cases. Accord: Edwards, supra, 512 F.2d at 290; Stueve, supra, 457 F.Supp. at 758; Hopkins, supra, 548 S.W.2d at 352. If the defendant is absolved of responsibility for a defective product even though the defect causes 49 percent or 50 percent of the loss, an inequitable allocation of damages will occur. The cost of the manufacturer's products will not accurately represent the risk that was caused by the defect. We believe that such systems under which the plaintiff can be barred from recovery do not further the equitable allocation of the loss from product related injuries.

## VII.

■ The foregoing analysis leads us to conclude that a system of comparative fault may effectively operate in strict products liability cases and will result in a more

---

that the California Supreme Court in Daly, supra, 575 P.2d at 1169–70 merged negligent assumption of risk with contributory negligence when comparative fault principles are applied to strict products liability cases.

[16] The Texas Supreme Court in Hopkins, supra, 545 S.W.2d at 352 adopted a pure comparative causation approach to product misuse cases.

equitable apportionment of the loss for product related injuries while furthering the valid policy goals behind the strict products liability action. We accordingly hold that a system of pure comparative fault should be applied to Restatement § 402A action in the Virgin Islands. Under this system, fault is ascribed to the defendant once his product is found to be defective. If fault on the part of the plaintiff is also present, the trier of fact shall reduce the damage award in proportion to the plaintiff's causal contribution to his own injury. Under our holding, the plaintiff shall not be barred from recovery even if his fault is determined to be greater than that of the defendant.

The task before us now is to determine what effect our holding has on the apportionment of the loss for Murray's injuries. Specifically, we must compare the principles which we today announce with the district court's application of the Virgin Islands' comparative negligence statute to the strict product liability count of this case.

 The district court simply applied comparative negligence principles and instructed the jury as follows:

> If you find, by a preponderance of the evidence, some negligence on the part of Norwilton Murray, which approximately [sic] contributed to the injuries which he received such negligence may be considered by you in offsetting the damages, if any, which you feel that the Defendant is responsible for under the theory of strict liability.

We believe such an instruction is not consistent with the evolving trends in comparative principles and strict products liability law. The application of the Virgin Islands' comparative negligence statute does not focus the jury's attention on the critical inquiry for apportioning damages in strict products liability cases: to what extent did the defect cause the injury and to what extent did the plaintiff's fault cause the injury. Unlike comparative negligence, comparative fault asks the trier of fact to al-

locate the loss solely on the causal connection between the faulty product, i.e., the defect and the injury and the faulty conduct of the plaintiff and the injury. Because we believe that a pure comparative fault approach utilizing causation as the conceptual basis for apportioning damages is appropriate in section 402A actions, we judicially recognize these principles for strict products liability actions in the Virgin Islands. Although the jury instruction in the instant case did not conceptually conform to the comparative fault principles we enunciate today, nonetheless it appears that the jury did reduce its award for damages caused by the defective product to the extent to which it found Murray's faulty conduct contributed to the accident. Any error in the instruction was therefore harmless.

Beloit in its direct appeal, however, argues that the five percent figure reached by the jury was incomprehensible in light of the jury's finding that Murray's negligence was a proximate cause of the injury. In essence, Beloit asks us to overturn the jury verdict as against the weight of the evidence. In order to do so, we would have to determine that the five percent figure is erroneous as a matter of law.

■ At the outset we note that the determination of the percentages of fault attributable to Murray under the negligence count is a question of fact primarily for the jury to determine. We are mindful that "[a]s an appellate court, it is our duty to take the view of the evidence which tends to support the jury's verdicts and we must accept as established all reasonable inferences arising from the testimony which tend to sustain such verdicts." Oliver v. Hallett Construction Co., 421 F.2d 365, 368 (8th Cir. 1970).

Our review of the record reveals that Beloit introduced expert testimony to prove that Murray's method of in-

stallation was highly dangerous. Beloit's expert testified that Murray could have taken safety measures to avoid or minimize the risk of a fall. He could have used an available movable scaffolding to install the unit from below or he could have stretched a cover over the open space to catch himself in the event of a fall. Further, Beloit's expert testified that safer alternative methods of installation were the preferred practice for installing units of the type installed by Murray.

Balanced against this evidence was testimony from Murray's supervisor and co-worker that the method used to install the unit was commonly employed without difficulty. Murray's supervisor testified that over an eighteen year period he had installed approximately 400 units in this fashion. The jury quite possibly rejected the expert testimony in favor of the practices used by Murray's employer. The jury could have concluded that Murray was simply following instructions utilizing a method he had commonly used before and that only five percent fault should have been attributed to his conduct.

We cannot say as a matter of law that the jury's assessment of five percent fault to Murray under the strict liability count was against the weight of the evidence. The jury is in the best position to weigh the evidence and the credibility of the witnesses. We therefore decline to overturn the jury's assessment of Murray's contributory fault and because the district court's instructions under the strict liability count were harmless, we reject Murray's cross-appeal and affirm the judgment of the district court.

Our discussion of apportioning damages has so far been directed only to the strict liability count. The parties themselves have apparently lost sight of the jury's verdict finding that Beloit negligently manufactured the unit and that Murray was also negligent in installing the

679

unit.[17] The jury assessed only five percent fault to Murray's conduct. The jury's assessment of damages under the negligence count was identical to that reached under the strict liability count. The negligence verdict was properly reduced because the Virgin Islands' comparative negligence statute applies to all negligence actions. We perceive no error in the district court's application of the statute to the negligence count and the judgment of the district court must be accordingly affirmed.

## VIII.

To summarize, we judicially recognize principles of comparative fault in Restatement (Second) of Torts § 402A cases in the Virgin Islands, under which the causal contribution of the product defect and the plaintiff's conduct are weighed by the trier of fact in apportioning damages. We leave undisturbed the application of the Virgin Islands' comparative negligence statute to products liability cases brought under negligence theory. Because we perceive no error in the district court's judgment under

---

[17] The confusion between the parties is illustrative of the confusion that often exists between counsel and the courts when products liability cases are tried under dual theories of strict liability and negligence. We suggest that in order to minimize the confusion engendered by the conceptual disparities between strict liability and negligence theories, the trial judge, at the final stages of pre-trial conference, should encourage the parties: (1) to elect the theory of recovery on which the case will proceed to trial, or (2) if the case is to be tried on alternative theories, to clarify and organize the evidence which will be presented under each theory. An election of theories may prove to be a desirable option because it

 should reduce the presentation of unnecessary and often conflicting evidence to the jury under inconsistent and sometimes contradictory theories of liability. It will facilitate the ultimate presentation of essential evidence to the jury with dispatch, coherence and proper sequence. The time required of lawyers, juries and judges will be substantially reduced.

Rosenn, Commentaries on "Product Liability: An Interaction of Law and and Technology," 12 Duquesne L.Rev. 465, 468 (1974).

 We recognize that Fed.R.Civ.P. 8(e)(2) permits claims to be pleaded alternatively. An election of theories would not disturb the plaintiff's ability to plead in the alternative, but would merely permit an election of the theory on which the plaintiff will proceed to trial.

either the strict products liability or negligence counts, the judgment of the district court is affirmed and Murray's cross-appeal denied.

Costs taxed against appellant Beloit in No. 78-2224 and against cross-appellant Murray in No. 78-2225.