**William DUNN, Plaintiff,**

v.

**OWENS–CORNING FIBERGLASS,
Defendant.**

Civ. No. 1987/238.

District Court, Virgin Islands,
D. St. Croix.

Sept. 27, 1991.

Joel Holt, Christiansted, St. Croix, V.I., Paul Minor, Minor & Benton, Biloxi, Miss., for plaintiff.

John M. Fitzpatrick, Wright, Robinson, McCammon, Osthimer & Tatum, Richmond, Va., Michael Dunston, Mary Faith Carpenter, Law Offices of A. Dudley, St. Thomas, V.I., Barry S. Simon, Paul Mogin, Williams & Connolly, Washington, D.C., for defendant.

## OPINION

MOTLEY, District Judge, sitting by designation.

### FACTS

In 1950, plaintiff, William Dunn, first went to work as a pipe installer's helper for Dow Chemical in Texas. A pipe installer performs the job of fitting insulation over pipes. This often requires cutting, sawing or pounding the insulation which creates dust. During plaintiff's career, this dust often contained asbestos. Plaintiff testified that Owens–Corning's Kaylo was the insulation that he used most frequently while performing these tasks and that the product contained no warning as to the dangers of asbestos. (Tr. v. IV at 128–29). Owens–Corning distributed Kaylo from 1948–1958 and actually bought the Kaylo producing plant in 1958.

In 1966, after working in various locales in the United States and Caribbean, plaintiff began working at the Hess Oil Refinery in St. Croix, Virgin Islands. (Tr. v. IV at 130). There plaintiff received, stored and fitted insulation. He testified that he was covered head to toe in dust from early in the morning until he left work and that

the principal insulation product he used was Owens–Corning's Kaylo. (Tr. v. IV at 135–136).

In the mid–1980s, Dunn began experiencing shortness of breath and was diagnosed as suffering from a lung condition caused by asbestosis. (Tr. v. IV at 145). Dunn had been a very athletic person who enjoyed running, swimming, biking and weight lifting (Tr. v. IV at 142) and he claimed that due to his lung disease, he was no longer able to work as an insulator or partake in the above athletic activities. Plaintiff alleged that the Kaylo product which Owens–Corning manufactured was a substantial cause of his lung problems.

The plaintiff, in his original complaint, had sued numerous manufacturers of asbestos. He settled, however, with a number of these defendants and defendants Celotex and Johns–Manville were bankrupt. Thus Owens–Corning was the only remaining defendant at trial. Plaintiff sought damages for present pain and suffering and future pain and suffering. He also asked for punitive damages.

The case was originally before Judge David O'Brien of this Court, but one week into trial the Judge became ill and subsequently died. The trial eventually took place over a two week period in November of 1990. After deliberation, the jury found defendant liable for $1.3 million in compensatory damages. The jury was then given an instruction regarding punitive damages and was once again sent out to deliberate. The jury returned a verdict for $25 million in punitive damages. Thus, in total, the jury awarded Dunn $26.3 million.

## JUDGMENT NOTWITHSTANDING THE VERDICT

■ Defendant, Owens–Corning, has moved this court for a Judgment Notwithstanding the Verdict (JNOV). The standard for a court to determine whether a JNOV should be granted or denied is whether "the record contains the minimum quantum of evidence from which a jury might reasonably afford relief." *Keith v. Truck Stops Corp.*, 909 F.2d 743, 745 (3d Cir.1990) (citations omitted). *See also Kin-*

*nel v. Mid–Atlantic Mausoleums, Inc.*, 850 F.2d 958, 961 (3d Cir.1988); *Smollett v. Skayting Development Corp.*, 793 F.2d 547, 548 (3d Cir.1986); *Denneny v. Siegel*, 407 F.2d 433, 439 (3d Cir.1969). When there is insufficient evidence to support the jury's verdict, a court is required to grant a JNOV. *See National Controls Corp. v. National Semiconductor Corp.*, 833 F.2d 491 (3d Cir.1987). In making such a determination, the court views the evidence in the light most favorable to the non-moving party. *Keith*, 909 F.2d at 747; *Fireman's Fund Ins. Co. v. Videfreeze Corp.*, 540 F.2d 1171, 1178 (3d Cir.1976), *cert. denied*, 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977).

■ Defendant asks that in the event this court does not direct a JNOV, it grant a new trial. The standard for granting a new trial is lower than the standard for directing a JNOV. "A district court ... may grant a new trial if required to prevent injustice or to correct a verdict that was against the weight of the evidence." *American Bearing Co. v. Litton Industries, Inc.*, 729 F.2d 943, 948 (3d Cir.), *cert. denied*, 469 U.S. 854, 105 S.Ct. 178, 83 L.Ed.2d 112 (1984). *See also Roebuck v. Drexel University*, 852 F.2d 715, 736 (3d Cir.1988) (when verdict is contrary to the great weight of the evidence a new trial is necessary). " 'The authority to grant a new trial, moreover, is confided almost entirely to the exercise of discretion on the part of the trial court.' " *American Bearing*, 729 F.2d at 948 (citing *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36, 101 S.Ct. 188, 190–91, 66 L.Ed.2d 193 (1980) (per curiam)). A trial court, however, must ensure when deciding whether to grant a new trial that it "has not simply substituted its judgment of the facts and the credibility of the witnesses for those of the jury." *Shanno v. Magee Industrial Enterprises, Inc.*, 856 F.2d 562, 567 (3d Cir. 1988) (*citing Lind v. Schenley Indus., Inc.*, 278 F.2d 79, 90 (3d Cir.) (en banc), *cert. denied*, 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960)).

Defendant has raised numerous points which it believes warrant a new trial. This

court will only address, in this opinion, those points which possess some merit.

## SUFFICIENCY OF THE EVIDENCE

■ Defendant claims that plaintiff failed to produce evidence that the Kaylo product was a substantial contributing factor in plaintiff's injuries. More specifically, defendant claims that plaintiff failed to put forth any expert medical testimony stating that Kaylo was a substantial contributing cause of plaintiff's injury. Defendant relies for this proposition solely upon the case of *Burton v. Johns-Manville Corp.*, 613 F.Supp. 91 (W.D.Pa.1985). *Burton,* however, does not stand for the proposition that expert medical testimony is necessary to link a specific product to a plaintiff's injury.

In *Burton,* the plaintiff's doctor, on cross-examination, testified that he was unable to state the extent to which asbestos from plaintiff's work-site contributed to his injury. The doctor did state on direct examination that plaintiff died of an asbestos related disease, that this disease was caused by asbestos from his job-site and elsewhere and that defendant's product caused asbestos dust to be released in the work place. The court firmly ruled that the evidence produced:

> was a sufficient basis for the jury to conclude under the instructions of the court on the law as it pertains to legal cause that defendant's defective product was a substantial contributing cause of decedent's disease and death. It was not necessary that plaintiff prove through expert opinion or otherwise that *defendant's* asbestos dust and fibers *independent* of other asbestos dust and fiber were a substantial contributing cause.

*Id.* at 94 (emphasis in original).

The *Burton* court did not insinuate that medical testimony is necessary to show proximate cause between an injury and defendant's particular product. Indeed, the court specifically held that testimony setting forth exactly how much one defendant's product contributes to the injury is not necessary and indeed may be even impossible. *Id.* In addition, the court was not attempting to set forth the minimum quantum of evidence necessary to establish proximate cause but was rather examining the evidence presented in that specific case.

Furthermore, and contrary to defendant's argument, in *Rocco v. Johns-Manville Corp.*, 754 F.2d 110, 113 (3d Cir.1985), the Third Circuit upheld the lower court's ruling that sufficient evidence supported the jury's finding that asbestos manufactured by Pittsburgh Corning was a factor causing plaintiff's injury. The Third Circuit stated that "[a]lthough the evidence was not overwhelming, there was enough for the jury to find that Unibestos, a product manufactured by Pittsburgh Corning, was used at the Shipyards where plaintiff had worked. The evidence consisted of several witnesses who testified that the product was manufactured by Pittsburgh Corning and that the product had been observed at the job sites." *Id.*

In *Johnson v. Celotex Corp.*, 899 F.2d 1281 (2d Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 297, 112 L.Ed.2d 250 (1990), defendant contended that there was not enough evidence to show proximate cause between the injury and the product. The court found that testimony from co-workers and witnesses as to product identification was sufficient to sustain the verdict. *Id.* at 1286. *See also LaDuca v. Celotex Corp.*, No. 89-7684 (2d Cir. April 23, 1990) (available on Lexis) (evidence that plaintiff worked with defendant's asbestos product, among others, sufficient to find defendant's product proximate cause of asbestos injury).

Similarly, in *Migues v. Fibreboard Corp.*, 662 F.2d 1182 (5th Cir.1981), the defendant argued that there was no substantial evidence that plaintiff was exposed to its products and no evidence at all that its products were a producing cause of the disease. *Id.* at 1184. Yet the Fifth Circuit found that there was sufficient evidence for the verdict because plaintiff demonstrated that Nicolet was a manufacturer of asbestos-containing insulation and co-workers confirmed that plaintiff had worked with the product. Plaintiff also produced medical evidence that an asbestos related

disease was the cause of death and that small quantities of asbestos could have produced the disease. *Id.* at 1185. *See also In re New York Asbestos Litigation,* 738 F.Supp. 66, 69 (E.D.N.Y.1990) (causation established when witnesses testified they worked with defendant's product and medical expert testified of link between asbestos and injury).

Regarding Dunn's injuries, Dr. Egilman, plaintiff's expert in occupational medicine, stated that plaintiff had "the exact injuries that you would expect if someone was injured from breathing in the asbestos." (Tr. v. I at 87). The doctor further testified that he was "certain that [Dunn had] asbestos-related lung disease, both in the lung tissue and around the lung." (Tr. v. II at 40). He further stated that exposure to Kaylo dust constituted exposure to a toxic substance. (Tr. v. I at 149–50). Dr. Cole, defendant's medical expert in radiology, testified that plaintiff's lungs exhibited pleural plaques and that asbestos exposure was probably the cause. (Tr. v. IV at 28, 31). Dr. Egilman also testified that a study conducted in 1952 found that guinea pigs that inhaled dust from the Kaylo product developed both asbestosis and tuberculosis. (Tr. v. II at 54). The above testimony demonstrates that Dunn suffered from an asbestos-related disease.

For the purpose of the present trial, the parties have stipulated that from 1953–1972, Kaylo contained an average of 15 percent asbestos with a variance on occasion of plus or minus five percent. (Tr. v. IV at 229; Tr. v. V at 74). The parties further stipulated that in 1972, Owens–Corning began producing an asbestos free Kaylo product and ceased production of the asbestos-containing product. (Tr. v. IV at 230, 231). These stipulations clearly show that Owens–Corning produced a product containing asbestos.

Mr. Bully, who worked at the Hess Oil Refinery in St. Croix installing pipe insulation under the supervision of Dunn, testified that insulation workers were covered with dust at the end of a day. (Tr. v. III at 143–44, 146–47). Bully testified that from 1969–1972, the product most often used at

Hess was Kaylo (Tr. v. III at 164). Dunn also testified that Kaylo was the product he used most frequently throughout his career. (Tr. v. IV at 152–53). The above testimony is clear evidence that plaintiff worked with the defendant's product.

After careful examination, this court finds that there was enough evidence in the record from "which a reasonable jury, using the common sense lay wisdom for which juries are so often praised," *Roebuck v. Drexel University,* 852 F.2d 715, 727 (3d Cir.1988), could infer that defendant's product was a substantial contributing cause of plaintiff's injury.

### INJURY AND DAMAGES

■ Defendant argues that Dunn suffered no compensable injury from his contact with asbestos. It claims that plaintiff does not suffer from asbestosis and that pleural plaques is a non-compensable injury that does not manifest itself in any harmful manner. This court finds that there was sufficient evidence for the jury to find that plaintiff suffered from asbestosis and other lung impairments.

■ Defendant further argues that the jury's award of $1.3 million in compensatory damages for present and future pain and suffering far exceeds any damage that Dunn actually suffered or would suffer in the future. This court has the power to grant a new trial on the issue of damages if the size of the verdict is "so grossly excessive that it is not rationally related to any evidence adduced at trial." *Warner v. Lawrence,* 754 F.Supp. 449, 456 (D.V.I.1991). *See also Brown v. McBro Planning & Dev. Co.,* 660 F.Supp. 1333, 1337 (D.V.I.1987) (new trial warranted when jury award is the result of passion and prejudice).

The evidence presented was sufficient to sustain the verdict, but not the award of damages. Dr. Egilman, plaintiff's medical expert, testified that Dunn suffered from scarring of the lung tissue and scarring of the tissue around the lung. As such, Dr. Egilman diagnosed plaintiff as suffering from asbestosis. (Tr. v. I at 83, 87). This scarring produced shortness of breath and

prevented the plaintiff from engaging in numerous activities in which he had, in the past, participated. X-rays, a CAT scan and accompanying reports confirm that there is scarring of the lungs and pleural plaques. (Tr. v. I at 86–87; Tr. v. II at 16, 23, 38–39; Tr. v. III at 135).

Dr. Egilman further testified that he heard rales in the plaintiff's lungs, which is consistent with lung disease produced by exposure to asbestos. (Tr. v. II at 37–38). It was also his belief that Dunn's disease was progressing at a rapid rate (Tr. v. II at 42), and that his total lung capacity would continue to decrease. He testified that plaintiff had a greater than fifty percent chance of dying from an asbestos related disease and that Dunn had a reasonable fear of contracting cancer. (Tr. v. II at 43).

Tests performed on plaintiff demonstrate that his lung capacity decreased about a quarter between 1985 and 1989 and that a further decrease occurred between 1989 and 1990. (Tr. v. II at 20–21). Such a large decrease in lung capacity is abnormal and is consistent with the diagnosis of asbestosis. (Tr. v. II at 22–23, Tr. v. III at 187–88). In addition, a small nodule (an abnormal growth) was also discovered on plaintiff's left lower lung. (Tr. v. II at 31). Dr. Egilman, however, testified that he did not believe that the growth was malignant at the present time, but that it needed to be examined and x-rayed every three months. (Tr. v. II at 34).

Dr. Kern, an occupational medicine specialist, confirmed that plaintiff had massive pleural plaques (Tr. v. III at 180–81) and that such a condition affects lung function. (Tr. at *id.*). He testified that these plaques were the result of occupational exposure to asbestos (Tr. v. III at 229) and that plaintiff had lost twenty percent of his lung function. (Tr. v. III at 218). Dr. Kern further confirmed that the plaintiff suffered from asbestosis (Tr. v. III at 185, 187, 189) and that during his examination of Dunn he heard rales. (Tr. v. III at 198–99).

Dunn himself testified that he experienced both shortness of breath and fatigue. (Tr. v. IV at 144–46). He has also lost weight and has been unable to work as an insulator or participate in athletic activities. (Tr. v. IV at 155). Plaintiff testified that he fears that he will develop cancer (Tr. v. IV at 155–57) and feels depressed. (Tr. v. IV at 158).

Defendant's doctors all found pleural plaques but did not diagnose the plaintiff as suffering from asbestosis. Defendant, furthermore, put on evidence that plaintiff was presently engaged in a wide variety of activities as demonstrated by medical reports made when plaintiff underwent knee surgery in Texas.

■ It was well within the jury's province to decide to credit the testimony of plaintiff's doctors while discounting that of defendant's. As previously stated, plaintiff's experts clearly testified that Dunn suffered from asbestosis, that his lung capacity had severely decreased, that there was more than a fifty percent chance of Dunn dying from this disease and that he had a reasonable fear of cancer. It was the jury's function to weigh the testimony and credibility of both plaintiff's and defendant's doctors and this court will not substitute its judgment for that of the jury's when the verdict is not against the weight of the evidence. *See Roebuck,* 852 F.2d at 736; *Lind v. Schenley Industries, Inc.,* 278 F.2d 79, 90 (3d Cir.) (en banc), *cert. denied,* 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960). Thus defendant's motion for a new trial because the verdict was against the weight of the evidence is denied.

■ Defendant also argues that it is entitled to a new trial because the compensatory damages awarded to Dunn were excessive. This court agrees that the $1.3 million which the jury awarded to plaintiff is an immense sum and far exceeds damage awards which have been returned in cases involving much greater injury from asbestos inhalation than this plaintiff exhibits. *See* Defendant's App. to Supp. Brief. Indeed plaintiffs in other cases, who suffer from lung cancer and mesothelioma, an incurable and fast progressing cancer, have often received verdicts of less than a million dollars. Furthermore, Dunn did not make a claim for either lost wages or past or future medical expenses but

rather based his claim solely upon past and future pain and suffering and fear of cancer. Indeed, it is undisputed that plaintiff presently works full time and that he continues to lead a somewhat active life.

■ The $1.3 million which the jury awarded in this case is both shocking and not reasonably related to the evidence produced regarding Dunn's injuries. Therefore, it is the duty of this court to require a new trial or remittitur. *Linn v. United Plant Guard Workers*, 383 U.S. 53, 66, 86 S.Ct. 657, 664, 15 L.Ed.2d 582 (1966); *Walters v. Mintec/Int'l*, 758 F.2d 73, 82 (3d Cir.1985). Remittitur is appropriate when the verdict is not the result of passion or prejudice. *Brown v. McBro Planning and Dev. Co.*, 660 F.Supp. 1333, 1337–1338 (D.V.I.1987). In this case, the verdict was not the result of passion or prejudice, but does constitute an excessive verdict.[1]

This court finds that the sum of $500,000 provides adequate compensation to Dunn and is much more consistent with the amount of damages which have been returned in similar cases of mild asbestosis. *See* Def.App. to Supp. Brief. Therefore, a new trial will be ordered on the grounds that the verdict was excessive, unless plaintiff accepts the sum of $500,000 for compensatory damages.

### BIFURCATION

■ Defendant argues that a new trial should be granted because this court did not reverse bifurcate the trial and allow the issues of injury and medical causation to be tried before the issues of product identification, corporate knowledge and punitive damages. A number of months before trial, Judge Broitman, acting Chief Judge of this Court, had ordered that the trial proceed in the above described manner.

Subsequently and shortly before trial, Judge Broitman ruled that the decision as to bifurcation should be left to the trial judge. This court ruled that the case would not be reverse bifurcated. Defendant claims that it was prejudiced by the court's refusal to reverse bifurcate because

it proceeded with the belief that its medical experts (under reverse bifurcation) would testify on November 14, 1990. Defendant's experts, however, were unavailable at this time and defendant made the decision to take these experts' *de bene esse* depositions. Defendant claims that if it had known that the trial was not going to be reverse bifurcated, it could have presented live testimony. Thus defendant states that it was denied the opportunity to present live testimony. Defendant furthermore claims that the court's refusal to reverse bifurcate the trial prejudiced the jury by allowing it to hear "evidence early in the case upon which plaintiff later sought punitive damages."

■ "[T]he fact that bifurcation did not occur is not necessarily prejudicial to the [defendant]. The decision to bifurcate is within the discretion of the trial judge." *Johnson*, 899 F.2d at 1289. *See also Simpson v. Pittsburgh Corning Corp.*, 901 F.2d 277, 283 (2d Cir.), *cert. dism'd*, — U.S. —, 111 S.Ct. 27, 111 L.Ed.2d 840 (1990) (same); *In re Master Key Antitrust Litigation*, 528 F.2d 5, 14 (2d Cir.1975) (same).

In this case, defendant can show no prejudice as a result of this court's decision not to reverse bifurcate the trial. The fact that this court rescinded Judge Broitman's order should have come as no surprise to the defendant because the Judge's order specifically stated that plaintiff's motion to reconsider bifurcation "is denied without prejudice, and plaintiff is free to raise the issue with Judge Motley prior to trial." Thus Judge Broitman's order specifically contemplated that his decision would be reconsidered shortly before trial. Consequently, defendant can claim no surprise and no prejudice.

In addition, defendant's argument that if it had known that reverse bifurcation would not occur it could have produced live testimony, is specious. Dr. Feingold, one of defendant's medical experts, specifically testified that he was unavailable at trial because his wife expected to give birth in

---

1. *See infra* for a further discussion of remittitur.

the near future. Even with modern technology's ability to predict when the birth of a child will occur, the difference of one week would not have assured this witness' availability. (Dep. of Dr. Feingold at 13). Dr. Hinshaw, another expert witness testified that he lived in California (quite a distance from the Virgin Islands), was 82 years old and had a very busy schedule. Obviously, his testimony being taken a week later would not have changed any of these facts.

Finally, it was not this court's order which deprived the defendant of live testimony, rather it was the order which called for reverse bifurcation which necessitated defendant's use of taped depositions in the first place. Thus Owens–Corning was left in exactly the same position that it would have been in if reverse bifurcation had occurred.

This court can find no prejudice in its refusal to reverse bifurcate.

## IMPROPER CONDUCT BY PLAINTIFF'S COUNSEL

Defendant claims that plaintiff's counsel behaved improperly on a number of occasions. It claims that such behavior was prejudicial and resulted in reversible error. First, defendant claims that during closing argument, plaintiff's counsel specifically requested the sum of $50,000 a year for compensation for pain and suffering and fear of cancer for the statistically relevant 19.6 remaining years of plaintiff's life.[2]

In *Waldorf v. Shuta*, 896 F.2d 723 (3d Cir.1990), the Third Circuit held that under federal law, counsel may not request a specific dollar figure for pain and suffering in closing argument. *Id.* at 744. Dunn argues, however, that this court's jurisdic-

tion was invoked, in paragraph one of his complaint, pursuant to 4 V.I.C. § 32. Thus, he argues that this case is purely local in nature as 4 V.I.C. § 32 is not a federal jurisdictional statute. Plaintiff argues that such a reference to a specific dollar figure is permissible because Virgin Islands law specifically provides that:

Notwithstanding any provision of law, in any cause of action based on tort, contract law, or otherwise to recover damages for injury or death to the person for harm to the plaintiff resulting from the defendant's wrongful conduct, no complaint or cross complaint shall specify the amount of damages but shall contain a prayer for general relief and shall state that the damages are within the jurisdictional limits of the court to which the pleading is addressed. *Nothing in the section shall be construed as preventing a party from asking for a specific amount of damages at the trial.*

5 V.I.C. § 5. (emphasis supplied). The Third Circuit, however, has stated that this statute is irrelevant to the issue of whether references to *ad damnum* clauses are allowed under Virgin Islands law. *Gumbs v. Pueblo Int'l, Inc.*, 823 F.2d 768, 771 n. 1 (3d Cir.1987).[3]

Judge Robert Carter (S.D.N.Y.), sitting by designation in St. Thomas, Virgin Islands, recently addressed the issue of whether *Waldorf* applies in the Virgin Islands. In *Warner v. Lawrence*, 754 F.Supp. 449 (D.V.I.1991), the court stated that:

Given the unique status of this court, it is not altogether clear whether *Waldorf* governs this case, or whether the propriety of the closing argument depends on local law. *See Murray v. Fairbanks Morse*, 610 F.2d 149, 152 n. 4 (3d Cir.

(Tr. v. VIII at 44–45).

**2.** Mr. Holt argued in his closing:
And, if you give him just $50,000 a year for the rest of his life, that's $1 million right there if you don't give him anything for the past.
And that's why in the beginning of this case, I told you, I was going to ask for a verdict in excess of $1 million. And for compensatory injuries of Mr. Dunn, I believe 1.3 million dollars is enough money to compensate him for what he's been through, but more important for what he's going to go through.

**3.** In *Gumbs*, decided before *Waldorf*, the Third Circuit stated that references to *ad damnum* clauses had in the past been allowed in the Virgin Islands as a matter of custom but refused to rule on the permissibility of such statements in either the Third Circuit or the Virgin Islands. *Gumbs*, 823 F.2d at 771.

1979) (in dictum treating this matter as an issue of local law). Although the Federal Rules of Civil Procedure apply to this court in the same manner as they apply to the ordinary United States District Courts, 48 U.S.C. § 1614(b), the position of this court may be different from that of an ordinary United States District Court with respect to the Appellate Courts' supervisory powers. *See Barnard v. Thorstenn,* 489 U.S. 546, 551–552, 109 S.Ct. 1294, 1298–99, 103 L.Ed.2d 559 (1989).

The Court of Appeals for the Third Circuit, however, would almost certainly reach the same result under local law as under federal law. The reasoning of *Waldorf, supra,* 896 F.2d at 744, that reference to the amount of damages in the closing argument is likely to encourage the jury to "irrationally inflate[ ] the damage award," does not depend on the federal-law context but is equally applicable to Virgin Islands law. The Court of Appeals has long expressed reservations about the propriety of such closing arguments in Virgin Islands cases, although it has repeatedly declined to decide the issue. *See Gumbs, supra,* 823 F.2d at 771. The Virgin Islands statute prohibiting *ad damnum* clauses in complaints, 5 V.I.C. § 5, does not affect the law concerning references to damages at trial. *Gumbs, supra,* 823 F.2d at 771 n. 1. Accordingly, whether the issue is covered by federal or local law, the plaintiff's closing argument was improper.

However, I do not recall the defendants' having made an objection to the plaintiff's closing argument at trial, and the court reporter has not been able to find any such objection in his stenographic notes. If the defendants did not object to the closing argument at trial, then they have waived their right to object now. *See Murray v. Fairbanks Morse, supra,* 610 F.2d at 152. Improper reference to the amount of damages in closing argument does not constitute 'plain error' reviewable in the absence of an objection.

*Id.* at 458.

■ This case is very similar to the *Warner* case. Owens–Corning claims that plaintiff's counsel, by mentioning a specific dollar figure, committed reversible error. Defense counsel, however, failed to object to counsel's statements at the time that they were made, after plaintiff's counsel concluded his closing or at any time before the jury deliberated. Defendant's failure to object constitutes a waiver and precludes it from seeking a new trial. *Murray v. Fairbanks Morse,* 610 F.2d 149, 152 (3d Cir.1979). Defendant's request for a new trial on this issue is denied because defendant failed to object to plaintiff's closing remarks during trial.[4]

■ Defendant's next contention is that plaintiff's attorney's conduct, which consisted of acting as if he was going to saw a piece of insulation and actually produce dust in the courtroom, highly prejudiced the jury. One juror attempted to cover her nose with a jacket to prevent inhaling the dust. (Tr. v. IV at 120–23). The insulation used in the courtroom, however, was asbestos-free Kaylo, was not actually cut with a saw, and thus posed no harm to the jurors, which this court clearly explained. (Tr. v. IV at 124). The court also prohibited plaintiff from any further demonstration. Thus this court cannot find that this demonstration was so highly prejudicial that it warrants a new trial.

## EXCLUSION OF DEFENDANT'S WITNESSES

Defendant next claims that this court improperly excluded Mr. Gillivan from testifying. Gillivan had been a juror when this case was tried for the first time before Judge O'Brien.[5] Defendant claims that the

---

4. Defendant also objects to plaintiff's counsel mentioning a specific dollar figure during closing argument of the punitive damage phase of the trial. Once again, however, defendant failed to object and has likewise waived this argument.

5. As previously explained, the case was first tried in May, 1989 in front of Judge O'Brien. At the close of plaintiff's case, Judge O'Brien became sick and died a few months later. A mistrial was declared.

witness would have testified that plaintiff's physical condition and behavior on the street differed from that in the courtroom during the trial. Defendant claims that plaintiff's counsel had previously interviewed the witness and that the defendant's counsel notified plaintiff of his intention to call the witness. Defendant argues that such testimony went to the plaintiff's credibility and, therefore, that this court's preclusion of such testimony resulted in prejudice to the defendant and constitutes reversible error.

■ The court excluded the testimony of Gillivan because it was untimely and defendant had not given plaintiff sufficient notice. Gillivan was not listed in response to plaintiff's discovery requests, nor was he listed in defendant's pre-trial submissions, nor on the witness list submitted during jury selection. Plaintiff's counsel strongly opposed the suggestion that they had ever interviewed Gillivan and swore an affidavit to this effect. Defendant cannot complain of prejudice in this court's failure to allow Gillivan to testify when defendant failed to inform opposing counsel or this court that such testimony would be proffered.

■ In addition, defendant contends that this court's failure to allow defendant to put on an economist during the punitive damage phase of the trial constituted similar error. Likewise, the first time that defendant offered such testimony was moments before the jury was to be charged, although defendant knew for years that plaintiff was requesting punitive damages. (Tr. v. VIII at 3–4).

Defendant argues that *Dabney v. Montgomery Ward & Co.*, 692 F.2d 49 (8th Cir.1982), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2429, 77 L.Ed.2d 1316 (1983) supports the argument that exclusion of these witnesses constitutes reversible error. However, in *Dabney*, the court stated:

'a district court may exclude from evidence at trial any matter which was not properly disclosed in compliance with the Court's pre-trial order, and such ruling will be reversed on appeal only for abuse of discretion.' *Iowa–Mo. Enterprises,*

*Inc. v. Avren*, 639 F.2d 443, 447 (8 Cir. 1981) [sic]; *Admiral Theatre Corp. v. Douglas Theatre Co.*, 585 F.2d 877, 897–98 (8 Cir.1978) [sic].

*Id.* at 51. In *Dabney* the court found that the witness had been only recently discovered, although there had been diligent investigation, and that under those circumstances, the witness should have been allowed to testify. No such situation exists in this case. Defendant does not claim that these were newly discovered witnesses and offers no excuse as to why these witnesses were not previously disclosed. Under a situation such as this, it was purely within the discretion of this court "to exclude testimony of a witness who had not been identified." *Semper v. Santos*, 845 F.2d 1233, 1238 (3d Cir.1988) (St. Croix court excluded witness when identified one day after start of jury selection). *See also Tunis Bros. Co. v. Ford Motor Co.*, 124 F.R.D. 95, 97–98 (E.D.Pa.1989) (failure to list witness justified excluding witness).

### EVIDENTIARY QUESTIONS

Defendant argues that this court erred in a number of rulings regarding the acceptance or rejection of specific evidence. This court will address the most meritorious of defendant's arguments.

■ First, defendant claims that it was error to allow the plaintiff to present evidence regarding lung cancer, mesothelioma and heart trouble. Defendant argues that plaintiff does not presently have such conditions and is unlikely to develop them in the future. In addition, defendant argues that the error was compounded by allowing plaintiff's medical expert to testify that a nodule discovered by a defense expert was potentially malignant. Defendant claims that the admission of such testimony was prejudicial because it allowed the jury to speculate about plaintiff's potential development of various diseases which he is unlikely to contract. It also claims that such evidence allowed plaintiff to go beyond issues framed in the pleadings and

various agreements of counsel.[6]

■■■ As plaintiff points out, however, plaintiff was not trying to recover for an enhanced risk of cancer, but rather for the emotional distress resulting from a fear of developing cancer. *See* Restatement (Second) of Torts § 905(e)(6) ("A seriously wounds B, who fears that the wound will cause death.... B is entitled to compensatory damages for the fear of death."). Such evidence must be allowed if the jury is to determine whether the plaintiff possesses a reasonable fear of developing cancer. In addition, there was ample evidence to show that exposure to asbestos can increase one's risk of developing numerous diseases. Defendant claims that it presented evidence that as a non-smoker plaintiff was not at a higher risk of developing cancer. However, it was up to the jury to weigh the credibility of such evidence.

Defendant relies upon *Adams v. Johns–Manville Sales Corp.*, 783 F.2d 589 (5th Cir.1986), to support its argument. In *Adams* the Fifth Circuit found that evidence regarding increased risk of cancer or reasonable fear of developing cancer could not be admitted because plaintiff failed to show an asbestos-related injury or any substantial likelihood of future injury. Defendant's reliance upon *Adams* is misplaced. First, the Fifth Circuit was explicitly interpreting Louisiana law in reaching its conclusion. Thus the ruling in that case has little applicability to the law of St. Croix or the Third Circuit. Second, in *Adams* it appeared that the plaintiff did not suffer *any* asbestos related injury. *Id.* at 590–91. In the case at hand, there was testimony, which the jury could choose to believe, that plaintiff suffered from pleural plaques and asbestosis which resulted from his exposure to asbestos.

Furthermore, at trial there was undisputed testimony that the nodule was benign. Plaintiff never insinuated that the nodule was malignant and this court clearly stated in its jury instructions that the jury must bear in mind the difference between compensating someone for a reasonable fear of cancer and compensation for cancer itself. (Tr. v. VIII at 136).

■■■ Defendant next claims that this court erred in allowing plaintiff's expert, Dr. Egilman, to offer his opinion as to the state of medical knowledge regarding the dangers of asbestos in the first half of this century. Defendant further states that: "During this process the Court ruled that it was permissible for plaintiff to ask leading questions of its expert in direct examination. Further, the Court erroneously permitted plaintiff's counsel to consult with Dr. Egilman at breaks in his direct examination." Defendant also claims that the court did not allow it to fully cross-examine the witness.

Dr. Egilman is a specialist in occupational medicine and as such was qualified to testify about the history of asbestos research and its effect on humans. The Advisory Notes to Fed.R.Evid. 702 state that "[t]he rule accordingly recognizes that an expert on the stand may give a dissertation or exposition of scientific or other principles relevant to the case, leaving the trier of fact to apply them to the facts." Clearly relevant to the liability of defendant in this case, and properly admitted, was evidence concerning when the scientific and business community first became aware of the dangers of asbestos. Thus defendant's motion as to this argument is denied.

■■■ Under Fed.R.Evid. 611, this court, in its discretion in governing the mode of interrogating witnesses, allowed plaintiff's counsel to address a number of leading questions to the witness as was necessary to develop the witness' medical testimony. No error can be assigned to this limited mode of interrogation. *See Alpha Display Paging, Inc. v. Motorola Communications & Electronics, Inc.*, 867 F.2d 1168, 1171 (8th Cir.1989) ("district court must be given great discretion in governing mode of interrogating witnesses"); *Government of Virgin Islands v.*

---

**6.** Defendant claims that plaintiff agreed prior to trial that the nodule was benign and would not be an issue at trial.

*Dowling,* 633 F.2d 660, 667 (3d Cir.), *cert. denied,* 449 U.S. 960, 101 S.Ct. 374, 66 L.Ed.2d 228 (1980) (no abuse of discretion when court allowed Virgin Islands prosecutor to use leading questions on direct examination). *See also* 3 Weinstein's Evidence 611–79 ("Rule 611(c) acknowledges that leading questions may be necessary to develop the testimony."). Defendant further argues that this court allowed Dr. Egilman to elaborate upon a number of answers during cross-examination. This was allowed only to clarify complicated medical testimony and was perfectly proper. *See United States v. Young,* 745 F.2d 733, 761 (2d Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985) (trial court has broad discretion in deciding whether or not to allow narrative testimony). Furthermore, after reading the record, this court can find no error regarding the testimony of Dr. Egilman which would require that a new trial be granted.

Next, defendant complains that it was unduly restricted in the cross-examination of the plaintiff. First, defendant argues that it should have been allowed to question the plaintiff regarding numerous aviation safety violations for which plaintiff was cited. Defendant claims that these violations were relevant to the issue of whether adequate warnings on Kaylo, if there had been such warnings, would have been effective. Second, defendant claims that it was error for this court to prohibit defendant from demonstrating that plaintiff continues to work. The court also prohibited defendant from introducing federal income tax returns and the fact that defendant has owned numerous houses in an attempt to demonstrate that plaintiff is not financially burdened and that he no longer has significant contacts with the Virgin Islands.

■ This court excluded the above testimony as irrelevant to the case. First, the plaintiff made no claim for lost wages or livelihood but rather only for pain and suffering. Thus the financial aspects of the plaintiff's present employment were entirely irrelevant. This court, however, specifically allowed the defendant to inquire as to whether the plaintiff was presently working and the nature of his present occupation. (Tr. v. IV at 110). Furthermore, the court allowed defendant to go into any medical history which would go to the plaintiff's current condition or health (Tr. v. IV at 220).

■ This court disallowed questioning as to plaintiff's aviation violations because any connection between his disregarding of aviation rules and disregarding of Kaylo warnings (assuming their existence) was entirely speculative. Under Fed.R.Evid. 401 such testimony would not have had any tendency to make the existence of any fact of consequence more or less probable. In this case, the acts are simply too dissimilar and too speculative to be relevant. In addition, Fed.R.Evid. 404 specifically states that "[e]vidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show conformity therewith." This appears to be precisely the reason defendant wished to elicit evidence of plaintiff's aviation violations and thus was properly ruled inadmissible. (Tr. v. VII at 82–88).

■ Defendant next argues that a document entitled the "Hemeon Report" should not have been introduced as evidence. The Hemeon Report is an unpublished 1947 technical report presented to the Asbestos Textile Institute which questioned the notion that the five million particle level for asbestos was safe. Owens-Corning argues that because it was not a member of this group, it could not have been on notice of the recommendations contained in the report. The Hemeon Report, however, may be introduced against companies who were not members to demonstrate what a company could have known if it had conducted similar studies or if it had contacted others in the industry. *See George v. Celotex Corp.,* 914 F.2d 26, 29 (2d Cir. 1990) (Hemeon Report relevant not to show what company knew but what company should have known).

Once again, after reading the record, this court does not find any reversible error regarding the cross-examination of plaintiff. Furthermore, the court does not find

any merit to the numerous other objections raised by the defendant.

### JURY INSTRUCTIONS

Defendant argues that this court failed to conduct any meaningful discussion regarding jury instructions after the court informed the parties which of their objections had been accepted or rejected. The court finds this argument to lack any merit. First, there was continuous discussion throughout trial regarding how this court would charge the jury. More importantly, the court specifically told the parties which instructions had been accepted or rejected and allowed the parties, at that time, to make comments, objections and arguments to the court. (Tr. v. VII at 99–120). " '[A] trial judge is not required to write out his charge in advance and submit it to counsel for their editing and exceptions,' *Puggioni v. Luckenbach Steamship Co.*, 286 F.2d 340, 344 (2d Cir.1961), and nothing in Federal Rule of Civil Procedure 51 dictates otherwise." *Emerick v. U.S. Suzuki Motor Corp.*, 750 F.2d 19, 23 (3d Cir.1984).

■ Defendant also argues that a number of specific instructions were prejudicial. First, defendant states that this court practically directed a verdict for the plaintiff by giving the following instruction: "Defendant, Owens–Corning, is liable for any damage you find that plaintiff is entitled to by reason of any defective product sold or manufactured by the defendant." (Tr. v. VIII at 120). Defendant contends that "[a]t a minimum this sentence should have included the words: provided it is a substantial contributing factor in bringing about injury to plaintiff." However, on the very next page of the record, the court instructed that: "Second, the plaintiff must prove that the defective condition of this defendant's product proximately caused injury to the plaintiff." (Tr. v. VIII at 121). Shortly afterwards, the court again instructed thoroughly on proximate cause

and substantial contributing factor. (Tr. v. VIII at 127–30). This court fails to see the manner in which defendant, in any way, was prejudiced. In addition, this court cannot find any objection from the defendant. Indeed, when this court asked the parties to put any exceptions to the charge on the record, defendant stated: "Your honor, generally we think the—there were a couple of places where we disagreed, but the court cured those in later paragraphs." (Tr. v. VIII at 151). Defendant's counsel then went on to object to three instructions given by this court, none of which concern defendant's present objection.

■ Next, defendant claims that it was prejudiced by the court's decision to require the jurors to calculate a dollar figure for each manufacturer listed on the verdict form who contributed to plaintiff's injury. Defendant claims that the jury should have only been asked to assign a percentage of negligence. It is defendant's theory that the jury failed to make any apportionment because they did not want to make the mathematical calculation. Defendant, however, did not object to this calculation being on the form [7] and indeed included a similar calculation on the proposed verdict form it submitted to the court. Furthermore, 5 V.I.C. § 1451, entitled "Comparative Damages," specifically states that "[w]here recovery is allowed against more than one defendant, the trier of fact shall apportion, in dollars and cents, the amount awarded against each defendant."

■ Defendant also argues that it was prejudiced by not having the bankrupt defendants included on the verdict form along with the list of settling defendants. Defendant cites the case of *Rocco v. Johns–Manville Corp.*, 754 F.2d 110 (3d Cir.1985), for the proposition that these defendants should have been included. *Rocco* simply does not answer the question of whether a bankrupt, non-settling, non-participating

---

**7.** Rather it was Mr. Holt, plaintiff's counsel, who stated "you want the jury to do all this math, or would you like them to do percentage [sic] and let the court do the math in all these." Only then did defense counsel state: "In fairness, I don't know that they're required to do it

for anyone other than us after they return a verdict against us in terms of dollars [sic] damages if they come back with the verdict. But, I think in apportioning a fault, the percentage is sufficient." (Tr. v. VIII at 143–144).

defendant should be listed on the verdict form. Furthermore, it was defendant who originally argued to this court that only the settling defendants should be included on the verdict form. The following colloquy occurred:

Court: How many [defendants] did you list in your proposed request to charge, in your proposed questions to the jury? Mr. Fitzpatrick: Your Honor, only those that are allowed to us by case law and statute, those that have settled. That's all.... We have not listed anyone who has not settled because of bankruptcy— because by statute we can't list those.

(Tr. v. V at 160). The transcript shows that Mr. Fitzpatrick went on to state that he wished that particular jury instructions be given regarding the bankrupt defendants, but that defendant's revised verdict form contained only the names of the settling defendants. (Tr. v. V at 160–66, 186–87). Indeed, it was defendant's verdict form that this court used in preparing the list of defendants for the court's verdict form. When the attorneys were given the verdict form to review, defendant did not object to the omission of the bankrupt defendants. After the court read the instructions, the parties again brought any objections to the verdict form to the court's attention and again defendant did not object. (Tr. v. VIII at 146–53).

Even if defendant had objected to the omission of these names, this court cannot find any prejudice that defendant suffered nor does defendant articulate any.

■ Defendant furthermore argues that the court's instructions regarding when a warning was necessary on a product misstated the law and conveyed the impression that defendant should have warned when the circumstances presented "even some potential danger." The court instructed that: "A manufacturer is under a duty to warn persons (whose exposure to the dangers inherent in its product are reasonably foreseeable) of the danger which in the exercise of reasonable care it either knew or should have known to exist at the time of exposure and to make that warning reasonably adequate under the cir-

cumstances." (Tr. v. VIII at 124–25). Shortly afterwards, the court stated:

In this connection, a manufacturer must take reasonable steps to keep abreast of knowledge as to the dangers of its products. Such knowledge as there is to be gained through research, scientific literature and other reasonable available methods of inquiry.

A manufacturer is held to that level of knowledge which a reasonably prudent person in a particular industry would have learned given the state of medical and scientific knowledge and technology at or before the time of exposure, not in the light of subsequent medical or scientific developments.

Based on what a manufacturer actually knew or should have known, a manufacturer must give such warnings as a reasonably prudent person in the position of the manufacturer would have considered necessary to avoid injury.

The greater the potential hazard of the product of which the defendant was aware or reasonably should have been aware, the more extensive must be the manufacturer's efforts to avoid injury by making that hazard known to the reasonably foreseeable user.

(Tr. v. VIII at 126). The charge was an accurate representation of existing law and the court can find no merit in defendant's contentions.

Although defendant has raised a number of other objections to the jury instructions, this court finds that defendant was not prejudiced in any manner and that the instructions were proper.

### THE CONSTITUTIONALITY OF PUNITIVE DAMAGES

■ Defendant claims that the imposition of punitive damages in multiple toxic tort suits is unconstitutional under the Due Process Clause of the Fifth Amendment, the Excess Fine Clause of the Eighth Amendment and other constitutional provisions. Defendant raised this argument a number of times during trial. This court, following the lead of a number of other courts throughout this country, rejects de-

fendant's arguments. The Supreme Court has previously ruled that the Excess Fines Clause of the Eighth Amendment does not apply to punitive damages. *Browning–Ferris Industries, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989). That case also suggests that the Cruel and Unusual Punishment Clause of the Eighth Amendment is not implicated in an award of punitive damages. *Id.* 109 S.Ct. at 2912. *See also Racich v. Celotex Corp.*, 887 F.2d 393, 397 (2d Cir.1989) (same).

Owens–Corning's principal argument seems to be that the multiple imposition of punitive damages, without limit, for the same conduct is violative of the notion of fundamental fairness embodied in due process. The Second Circuit has stated that "the multiple imposition of punitive damages for the same course of conduct *may* raise serious constitutional concerns, in the absence of any limiting principle." *Racich,* 887 F.2d at 398 (emphasis added). The Second Circuit has even more recently held that a defendant, in order to sustain an argument regarding the imposition of multiple damages, must present evidence of previous punitive damage awards, whether these cases are presently on appeal or whether the cases settled, and how much in damages has *actually* been paid to plaintiffs. Without such a record a court cannot answer the due process argument. *Simpson v. Pittsburgh Corning Corp.,* 901 F.2d 277, 280–82 (2d Cir.), *cert. dism'd,* —— U.S. ——, 111 S.Ct. 27, 111 L.Ed.2d 840 (1990). *See also LaDuca v. Celotex Corp.,* No. 89–7684 (2d Cir. April 23, 1990) (available on Lexis); *Johnson v.*

*Celotex Corp.,* 899 F.2d at 1287–88.[8] This court specifically asked defendant's counsel what punitive damage awards had been assessed against Owens–Corning prior to this trial. Defense attorney stated that he thought punitive damages were assessed three times in fifteen years but that he could not be sure. When this court inquired as to the amount of these punitive damage awards counsel stated, "I was just recently hit with punitive damages in the state of Virginia for $100,000 ... then there was another verdict I think it was for $35,000. And one may have been for $1 million. I'm not sure." (Tr. v. V at 86–87). Never did counsel state whether these awards were actually paid out or whether the cases are on appeal. It was only in defendant's supplemental papers[9] regarding the motion for a JNOV that defendant submitted an affidavit regarding past punitive damages that have been assessed against Owens–Corning. This court can fathom no reason why defendant did not include this information in the memorandum submitted to this court during trial or mention this when the court specifically questioned counsel. Defense counsel are experienced attorneys in the field of asbestos litigation and were clearly aware that plaintiff was asking for punitive damages.[10]

Even if such a record had been made during trial, when defense counsel were given every opportunity to do so, no court in the country has squarely declared that the imposition of multiple punitive damages constitutes a Fourteenth Amendment violation. Rather this court agrees with the statement of the Second Circuit that such a

---

**8.** At least one court has found that the imposition of multiple punitive damages is not a violation of due process. *See Guarino v. Armstrong World Indus., Inc.,* No. 88–1087 Civ. (S.D.Fla. Oct. 13, 1989) (available on Lexis) (the concept of fundamental fairness embodied in substantive due process does not require that defendant be protected from the imposition of multiple punitive damages).

**9.** These supplemental papers were submitted eight months after trial and defendant's first memorandum regarding the JNOV. This delay was the result of the court and the parties waiting for the trial transcripts to become available.

However, the issue of punitive damages which Owens–Corning had previously paid was in no way related to the availability of the trial transcripts.

**10.** Likewise, defendant could have introduced evidence at trial regarding past punitive awards, but chose not to do so. *See Acosta v. Honda Motor Co.,* 717 F.2d 828, 839 n. 17 (3d Cir.1983) ("a jury might decide that a defendant's financial position, as a result of other awards of punitive damages for the same conduct, is so precarious that a sizable award of punitive damages would be inappropriate.").

holding "would be a far-reaching holding, indeed, particularly in the context of mass tort litigation that suggests the need for a uniform, national rule on the issue. Under all the circumstances, we believe that such a step, if it is to be taken (and we express no view as to that), is best left for Congress or for higher judicial authority." *Johnson*, 899 F.2d at 1288 (*quoting Racich v. Celotex Corp.*, 887 F.2d 393, 399 (2d Cir.1989)). *See also Moran v. Johns–Manville Sales Corp.*, 691 F.2d 811, 817 (6th Cir.1982) (argument regarding multiple punitive damages more appropriately addressed to state or federal legislature); *Cathey v. Johns–Manville Sales Corp.*, 776 F.2d 1565, 1569–70 (6th Cir.1985), *cert. denied*, 478 U.S. 1021, 106 S.Ct. 3335, 92 L.Ed.2d 740 (1986) (same); *Jackson v. Johns–Manville Sales Corp.*, 781 F.2d 394, 406 (5th Cir.) (en banc), *cert. denied*, 478 U.S. 1022, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1986) (same).

■■■ Defendant also argues that the punitive damage instruction to the jury did not include any standard for determining whether an award was appropriate or the manner in which an award was to be calculated. Recently, the Supreme Court stated that "we cannot say that the common-law method of assessing punitive damages is so inherently unfair as to deny due process and be *per se* unconstitutional." *Pacific Mut. Life Ins. Co. v. Haslip*, —— U.S. ——, ——, 111 S.Ct. 1032, 1043, 113 L.Ed.2d 1 (1991).

This court instructed the jury that punitive damages should be returned only if the jury found that plaintiff "clearly and convincingly established that the action of defendant which caused injury to the plaintiff was wanton and reckless." (Tr. v. VIII at 209). The charge further instructed that the amount the jury chose to award was entirely up to them and that they were not required to award punitive damages. (Tr. v. VIII at 209–10). The court also made clear that the purpose of punitive damages was to act as a deterrent. (Tr. v. VIII at 210–11). These standards have been expressly adopted by the Third Circuit as the correct ones. *Berroyer v. Hertz*, 672 F.2d

334, 340 (3d Cir.1982); *Acosta v. Honda Motor Co.*, 717 F.2d 828, 833 (3d Cir.1983). *See also Justin v. Guardian Ins. Co.*, 670 F.Supp. 614, 617 (D.V.I.1987) (to get to a Virgin Islands jury on the issue of punitive damages, the plaintiff must show *by clear and convincing evidence* "that the acts complained of were outrageous, done with evil motive or reckless indifference to his rights.").

Indeed the Supreme Court in *Haslip* upheld Alabama's punitive damage law even though its standard of proof only required that the jury be "reasonably satisfied from the evidence." *Haslip*, 111 S.Ct. at 1046 n. 11. By requiring clear and convincing evidence, Virgin Island law provides even greater procedural protection for the defendant than the Supreme Court requires. This court can only conclude that instructions such as those given in the Virgin Islands serve to "reasonably accommodate[ ] [defendant's] interest in rational decision making and [the state's] interest in meaningful individualized assessment of appropriate deterrence and retribution." *Haslip*, 111 S.Ct. at 1044.

In *Haslip* the Supreme Court cited the fact that Alabama provided post-verdict review of punitive damages as adding to defendant's due process safeguards. The Supreme Court, however, did not insinuate that such procedures were mandated by the constitution or that post-verdict review pursuant to the Federal Rules of Civil Procedure was constitutionally inadequate. Indeed at least one circuit, applying *Haslip*, found that post-trial procedures which were not as detailed or as specific as that found in Alabama satisfied all constitutional concerns. *See Eichenseer v. Reserve Life Ins. Co.*, 934 F.2d 1377, 1384–86 (5th Cir.1991) (upholding Mississippi law which provides that courts may set aside punitive damages only when an award is the result of passion, bias and prejudice). As demonstrated *infra* the Federal Rules of Civil Procedure have provided, in this case, a "definite and meaningful constraint on the discretion" of this jury. *See Haslip*, 111 S.Ct. at 1045.

Defendant finally argues that the court's instructions were incorrect because § 908 of the Restatement (Second) of Torts lists the nature and extent of the harm to the plaintiff as a factor which the jury may take into account when fashioning an award of punitive damages. Defendant, however, failed to object to this specific instruction when the court asked the parties for any objections. (Tr. v. VIII at 211–212). Defendant merely stated that the charge was "unconstitutionally uninformed and that it does not provide standards for the jury upon which to base an award of punitive damages." (Tr. at *id.*). This objection was simply a reiteration of what defendant had argued both orally and in a written motion regarding the constitutionality of punitive damages and was in no way related to the Restatement. This generalized objection is insufficient under Fed. R.Civ.P. 51 which states that an objection must be stated distinctly as to its matter and grounds. Indeed, after making this general objection, Owens–Corning's counsel continued by stating "with regard to the charge, itself, Your Honor, we would on Page 34, object additionally...." (Tr. v. VIII at 212). Defendant then went on to list specific instructions. The purpose of Rule 51 is to avoid a retrial when the losing party fails to make a timely objection. *See* 9 Wright and Miller, *Federal Practice and Procedure* § 2551. A curative instruction on this matter could have alleviated any alleged defect. Defendant has waived any objection regarding any deficiency as related to the Restatement.[11]

## EVIDENCE OF WILLFULNESS OR WANTONNESS

A review of the evidence shows that an award of punitive damages was supported by the evidence. Plaintiff produced evidence at trial from which the jury could have reasonably concluded that the defendant acted in a wanton or reckless manner. Plaintiff, through the testimony of experts and numerous documents, demonstrated that Owens–Corning knew since at least the early 1940s that the asbestos contained in Kaylo was a dangerous substance and produced disease in human beings. *See, e.g.,* Tr. v. III at 245; Tr. v. V at 19–25; Pl.Exh. 9, 57.

In the 1940s, Owens–Corning was having difficulty with asbestos workers who were demanding higher wages when using fiberglass material than when using asbestos-containing material. These workers believed that fiberglass could produce health hazards. As a result of the union's demands, Edward Ames, Owens's public relations officer and assistant to the president, circulated an internal memorandum on January 7, 1942, which proposed that asbestos workers be informed of the extent of the hazards posed by asbestos-containing insulation. Ames wrote the following in his memorandum:

> Gather as a weapon-in-reserve an impressive file of photostats of medical literature on asbestosis. Available are two bibliographies covering medical literature to 1938, citing references to scores of publications in which the lung and skin hazards of asbestos are discussed.

(Pl.Exh. 9).

Ames testified that Owens–Corning knew by this time that exposure to asbestos fibers could cause asbestosis and that Mr. Boeschenstein, President of Owens–Corning, "knew everything." (Tr. v. III at 245–46).

Mr. Ames, in 1943, wrote a further memorandum criticizing Owens–Corning's proposal of adding asbestos to fiberglass. The memorandum states:

> In formulating our policy on admixtures with asbestos, we should keep on alert because otherwise *we will run the risk of smearing fiberglass with the hazards of exposure to asbestos.*
>
> Fabrication of asbestos (in both textile and pre-textile form) is a dusty process, and exposure to asbestos fly involves the

---

**11.** Defendant did not even bring up these arguments regarding the Restatement until it filed the *supplemental* brief.

danger of asbestosis, a pathological lung condition. . . .

Pl.Exh. 15 (emphasis in original).

In the 1950s, Dr. Schepers, head of the Saranac laboratory in New York, warned Owens–Corning that Kaylo contained material which would be dangerous to human beings. (Tr. v. V at 24). During this time period, Dr. Schepers wrote a letter to Dr. Burch, an Owens–Corning employee, stating that "asbestos is fairly well incriminated as a carcinogen" and that asbestos caused fibrosis. (Pl.Exh. 35 and 38).

Although defendant produced a witness from Owens–Corning, Jerry Helser, who testified that warnings were placed on Kaylo products in 1966 (Tr. v. VI at 14–16), Dunn and Bully both testified that they never saw any such warnings. (Tr. v. IV at 136; Tr. v. III at 150–51). Plaintiff produced a great deal of additional material which demonstrated that both Owens–Corning and the medical community knew of the dangers of asbestos. Thus, "[t]he jury was free to conclude ... that appellants knew of the dangers of asbestos and did not adequately warn users of asbestos, thereby acting in a wanton or reckless manner." *Johnson*, 899 F.2d at 1288.

## PLAINTIFF'S ATTORNEY'S CONDUCT DURING CLOSING ARGUMENT REGARDING PUNITIVE DAMAGES

▪ Defendant claims that plaintiff's counsel's remarks during closing argument regarding punitive damages were highly inflammatory and prejudicial and thus warrant a new trial. Defendant claims that plaintiff argued to the jury that counsel for Owens–Corning lied to them during trial and that defendant's attorneys had engaged in an effort to cover up damaging

information.[12] Owens–Corning also argues that plaintiff's counsel's statement that Owens–Corning refused to establish a trust fund to compensate deserving victims was highly prejudicial. Although, arguments such as these may not be proper in a closing argument regarding liability, they are not improper in a summation regarding punitive damages. "In attempting to convince a jury that a defendant's conduct was outrageous and should be punished, an advocate must go beyond the kind of argument necessary to establish ordinary negligence." *Herman v. Hess Oil Virgin Islands Corp.*, 379 F.Supp. 1268, 1276 (D.V.I.1974), *aff'd*, 524 F.2d 767 (3d Cir. 1975).

Defendant cites the case of *Draper v. Airco, Inc.*, 580 F.2d 91, 96–97 (3d Cir.1978) for the proposition that this court must order a new trial due to counsel's remarks. In *Draper*, however, counsel during closing argument *on liability* prejudiced the jury by repeatedly referring to material which was not in evidence, the wealth of the defendant, the poverty of plaintiff's widow, his personal opinion as to the guilt of the defendant, and by actually pointing at defendant's lawyers and accusing them of being part of the conspiracy. *Id.* at 95–96. In this case, plaintiff's counsel did not come close to the undignified, discourteous and prejudicial conduct in which the attorney in *Draper* engaged. Indeed, it is unclear whether the comments to which defendant points were directed at defendant's counsel or at statements from various corporate agents and defense witnesses.

▪ The only possible prejudice which this court can find in plaintiff's summation regarding punitive damages is what could conceivably be considered an appeal to local

---

**12.** Plaintiff's counsel stated the following in closing argument on the issue of punitive damages:

It's incredible for me to stand here to tell you that. But for 50 years, 1940, this company knew from the documents that you've seen and have presented to you, that asbestos-containing products caused permanent lung damage, later, that it caused cancer and mesothelioma. And it did nothing about it except suppress that information.

Unfortunately, ladies and gentlemen, you have heard a story here in this courtroom the last two weeks of corporate manipulation, of corporate suppression, and a word that I hate to use, of corporate lies.

But, what's so bad about that is just not things that occur over the last 40 or 50 years. But, it's even occurred in this courtroom. It's occurred in this courtroom.

(Tr. v. VIII at 188).

Defendant interprets these remarks as an attack on counsel.

prejudice. Plaintiff stated the following: "You've got to have the courage to tell this big multi-national company, that it's not going to come into the Virgin Islands and hurt people and lie about it." (Tr. v. VIII at 195). After plaintiff's closing, defendant moved for a mistrial stating that plaintiff's remarks regarding defendant's "lying" were highly prejudicial. Defendant never objected to the closing on the grounds that plaintiff appealed to local prejudice. See DeRance, Inc. v. PaineWebber, Inc., 872 F.2d 1312, 1326–27 (7th Cir.1989) (a motion for a mistrial due to alleged prejudice arising from closing argument must specifically state grounds for motion; global objection to entire argument as prejudicial does not contain requisite specificity; therefore, similar closing argument regarding local prejudice held permissible as variation on argument that "punitive damages must serve as an example to a particular community"). In the absence of an objection, this court does not find these scattered remarks to be so prejudicial that a new trial is warranted. Hess, 524 F.2d at 772 ("While an appeal for local prejudice against foreign defendants is never permissible even where punitive damages are sought, we do not believe that the isolated remarks ... which were arguably an appeal to local sentiment in this case were so prejudicial ... as to constitute reversible error in the absence of any objection or request for cautionary instruction."). Furthermore, this court does not believe that anything plaintiff said, in terms of Owens–Corning being a foreign corporation which shipped products into the Virgin Islands, was not obvious from testimony and evidence presented during trial.

Although plaintiff's counsel's arguments may have come close to the borderline, they did not transgress it.[13] This court has read the transcript of the argument and finds that counsel's arguments were fair comment on the evidence and do not warrant a new trial.

---

**13.** Defendant claims that a number of plaintiff's counsel's statements were prejudicial. As previously stated the defendant failed to specifically object to any of these statements and as such has waived the argument. As stated in the text of this opinion, even if defendant had objected, this court finds defendant's arguments to be without merit.

## AMOUNT OF THE AWARD

As previously stated, a jury award should be reduced only if it is "so grossly excessive as to shock the judicial conscience." Black v. Stephens, 662 F.2d 181, 192 (3d Cir.1981), cert. denied, 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876 (1982) (quoting Murray v. Fairbanks Morse, 610 F.2d 149, 152–53 (3d Cir.1979)); Edynak v. Atlantic Shipping, Inc., 562 F.2d 215, 225 (3d Cir.1977), cert. denied, 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978). See also Rocco v. Johns–Manville Corp., 754 F.2d 110, 114 (3d Cir.1985). In such a case, however, "where there is no clear judicial error or 'pernicious influence' ... but where the verdict is so large as to shock the conscience of the court" the court can order plaintiff to "remit the portion of the verdict in excess of the maximum amount supportable by the evidence or, if the remittitur were refused, to submit to a new trial." Kazan v. Wolinski, 721 F.2d 911, 914 (3d Cir.1983).

In Brown v. McBro Planing & Dev. Co., 660 F.Supp. 1333 (D.V.I.1987), the District Court of the Virgin Islands stated:

The Court can grant a remittitur and propose a reduction in the jury award when in its discretion it decides that a verdict is so grossly excessive that it is not rationally related to any evidence adduced a [sic] trial. See David v. Pueblo Supermarket of St. Thomas, Inc., 740 F.2d 230, 239 (3rd Cir.1984); Edynak v. Atlantic Shipping, Inc., 562 F.2d 215, 226 (3d Cir.1977) (a jury verdict cannot stand when it is "so grossly excessive as to shock the judicial conscience"), cert. denied, 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978); Murray v. Beloit Power Systems, Inc., 79 F.R.D. 590, 592 (D.V.I.1978) (remittitur is proper when damages assessed by a jury are so unreasonable as to offend the conscience of the court); Lettsome v. Elmer, 1977 St. Croix Supp. 154 (D.V.I.1977) (remittitur is proper when the court has a "definite

and firm conviction that a mistake has been made" and where the amount of the jury award "offends the conscience of the court"). When the court finds that the jury award was the result of passion and prejudice, the proper remedy is a new trial. But where the verdict is not patently the product of bias, passion, or prejudice, but is simply excessive, the court can grant a remittitur.

*Id.* at 1337.

█ The jury was instructed that any award for punitive damages should sting the defendant and act as a deterrent to such conduct in the future. (Tr. v. VIII at 211). Furthermore, "[i]t is well settled that the wealth of the defendant is a factor which may properly be considered by the trier of fact in assessing punitive damages." *Herman v. Hess Oil Virgin Islands Corp.,* 524 F.2d 767, 772 (3d Cir. 1975). In this case, plaintiff's economist, Lawrence Roberts, testified as to the worth of Owens–Corning. He testified that Owens–Corning, for the last three years, had a net average earning after all expenses and income taxes were paid of $196,333,333. (Tr. v. VIII at 176). He read from the Owens–Corning 1988 annual stockholders' report in which the Board of Directors stated the following: "the additional cost which may arise out of pending personal injury and property damage, asbestos claims and additional similar asbestosis claim problems in the future will not have a materially adverse effect on the company's financial position." (Tr. v. VIII at 178). Mr. Roberts further testified, however, that the company was $435 million in debt and had over 73,000 cases pending in court. (Tr. v. VIII at 179–80). The jury was entitled to use this information to determine what size award would sting the defendant.

This court realizes that Owens–Corning is a large and profitable corporation and that the jury could have found that Owens–Corning knew of the serious risk which asbestos dust poses much earlier than it suggests. Yet $25 million is a tremendous award and over nineteen times as large as

the jury's overly generous compensatory award.[14] Indeed, the Supreme Court cautioned that a punitive damage award which was four times the amount of the compensatory award may be close to the line of what is constitutionally permissible. *Haslip,* 111 S.Ct. at 1046.

█ This court further recognizes that it cannot simply substitute its own judgment as to the appropriate amount of punitive damages without infringing upon plaintiff's constitutional right to a jury trial. It appears obvious that the jury wished to sting Owens–Corning and punish it for past actions. Thus this court's suggestion of a reasonable figure will not be an unwarranted infringement upon plaintiff's right to have the jury determine the award, as long as the figure that this court suggests accomplishes the same goal which the jury had in mind. *Herman v. Hess Oil Virgin Islands Corporation,* 379 F.Supp. 1268, 1277 (D.V.I.1974), *aff'd,* 524 F.2d 767 (3d Cir.1975). The court concludes that a reasonable figure is $2 million. This constitutes a substantial sum and will accomplish deterrence while at the same time avoiding excessive punishment and the diversion of substantial sums of money from other deserving victims. *See id.* at 1277. Furthermore, the court recognizes that the jury's award of $25 million in punitive damages was one of the largest awards of its kind. In reducing this award, in order to effectuate the jury's intent, it is proper that this award be towards the high end of what juries have awarded in other cases. *See* App. to Def.Supp. Memorandum. Finally, the sum is rationally related to the $500,000 in compensatory damages (*cf. Perez v. Weigers,* Civ. 155/1989, 1990 WL 181171 (D.V.I. Oct. 12, 1990) (available on Lexis) (award for punitive damages twice the amount of compensatory damages satisfied requirement that punitive damages must be rationally related to actual injury)), without having exceeded the multiple of four constitutionally permitted by the Supreme Court in *Haslip.*

---

**14.** It is fifty times larger than the $500,000 to which this court reduced the award.

Owens–Corning's motion for a new trial on punitive damages is denied on the condition that plaintiff file a remittitur.